# IN THE SUPREME COURT OF TENNESSEE
## AT JACKSON
### November 14, 2001 Session

## STATE OF TENNESSEE v. TIMOTHY McKINNEY

**Appeal from the Court of Criminal Appeals**
**Criminal Court for Shelby County**
**Nos. 98-01434, 98-01435     Joseph B. Dailey, Judge**

---

**No. W1999-00844-SC-DDT-DD - Filed March 26, 2002**

---

The defendant, Timothy McKinney, was convicted of premeditated first degree murder and attempted second degree murder. The jury imposed a death sentence for the first degree murder after finding that evidence of an aggravating circumstance, *i.e.*, the defendant was previously convicted of a felony whose statutory elements involved the use of violence to the person, outweighed evidence of mitigating circumstances beyond a reasonable doubt. The trial judge imposed a sentence of twelve (12) years for the attempted second degree murder, to run consecutively to the death sentence.

After the Court of Criminal Appeals affirmed the convictions and the sentences, the case was automatically docketed in this Court. We entered an order specifying six issues for oral argument,[1] and we now hold as follows: (1) the trial court did not commit error by denying the defendant's motion to introduce expert testimony on the issue of eyewitness identifications; (2) the jury's verdict form was sufficiently clear to demonstrate that the jury found the prior violent felony aggravating circumstance relied upon by the prosecution; (3) the evidence was sufficient to sustain the prior violent felony aggravating circumstance found by the jury; (4) the trial court's refusal to allow defense counsel to refer to evidence from the guilt phase of the trial during his closing argument in the sentencing phase of the trial did not affect the jury's determination to the prejudice of the defendant and was harmless error; (5) the trial court did not commit error in admitting victim impact evidence during the sentencing phase; and (6) the sentence of death was neither arbitrary nor disproportionate. We also conclude that the evidence was sufficient to support the jury's findings that the prior violent felony aggravating circumstance had been established beyond a reasonable doubt and that it outweighed evidence of mitigating factors beyond a reasonable doubt. Finally, we agree with the Court of Criminal Appeals' conclusions with respect to the remaining issues, the

---

[1]     "Prior to the setting of oral argument, the Court shall review the record and briefs and consider *all* errors assigned. The Court may enter an order designating those issues it wishes addressed at oral argument." Tenn. Sup. Ct. R. 12.2.

relevant portions of which are included in the appendix to this opinion. Accordingly, we affirm the judgment of the Court of Criminal Appeals.

**Tenn. Code Ann. § 39-13-206(a)(1); Judgment of the Court of Criminal Appeals Affirmed**

E. RILEY ANDERSON, J., delivered the opinion of the court, in which FRANK F. DROWOTA, III, C.J., and JANICE M. HOLDER and WILLIAM M. BARKER, JJ., joined. ADOLPHO A. BIRCH, JR., filed a concurring and dissenting opinion.

William Gosnell, C. Michael Robbins, and William D. Massey, Memphis, Tennessee, for the appellant, Timothy McKinney.

Paul G. Summers, Attorney General and Reporter; Michael E. Moore, Solicitor General; Gordon W. Smith, Associate Solicitor General; William L. Gibbons, District Attorney General; Phillip Gerald Harris and David Henry, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

**BACKGROUND**

**Guilt Phase**

The evidence in the guilt phase of the trial of Timothy McKinney for premeditated first degree murder and attempted second degree murder is summarized as follows:

On the night of December 25, 1997, the victims, Donald Williams and Frank Lee, were working as security guards for Crumpy's, a nightclub in Memphis, Tennessee. Both Williams and Lee were off-duty Memphis police officers.

The defendant, Timothy McKinney, was attending a party at the nightclub. Later that night, the defendant, who was wearing a black derby, multi-colored sweater, gold vest, dark pants, and gold shoes, left the club and became upset when he could not find his car in the parking lot. Although Williams and Lee assured him that his car was in the parking lot, the defendant screamed, "My car's been stolen, somebody's going to pay for it, or I'm going to come back and shoot up the club or blow it up." Williams urged the defendant to calm down and stop making threats. The defendant replied that "he didn't care about going to jail" because he had just finished serving twenty-three months.

Shortly thereafter, a friend of the defendant's, Yarron Young, came out of the club and found the defendant's car in the parking lot. While Young was outside, Lee separated the defendant and Williams. Young testified that the defendant was speaking loudly and was drunk, and that he heard the defendant say he would "be back." Another witness, Stephon Spencer, talked to the defendant near his car. The defendant told Spencer that "he had gotten into it with a security guard" and that the guard had hit him. Spencer did not see any sign that the defendant had been injured.

The defendant then drove out of the parking lot, but later returned and tried to re-enter the club. Lee told the defendant that he was not permitted back into the club and offered to go inside and find his friends. The defendant refused the offer and instead waited outside the club beneath a light pole. Lee testified that the defendant "just sat there and looked at us all night." Williams called the Memphis Police Department and requested that a patrol car investigate. Although the defendant eventually left, he returned yet again and parked his car in the lot.

Memphis police officer Ronald Marshall arrived at the scene on an unrelated matter, and Williams spoke to him about the defendant. When McKinney again tried to enter the club, Officer Marshall stopped him, placed him in a patrol car, and asked him why he had returned to the club. The defendant told Marshall that he "did not want any trouble." Marshall took the defendant's driver's license and gave it to Williams, who wrote down the defendant's name, date of birth, and address. When Williams said that he did not want an arrest to be made, Marshall told the defendant to leave the scene, and he complied.

Joyce Jeltz testified that later, around 2:30 or 3:00 a.m. on the morning of December 26, she saw a man running toward Williams and Lee with a gun against his right leg, and she saw the man shoot Williams "point blank in the back of his head." Jeltz said that the man was wearing brown pants and an unbuttoned vest. She later selected two men from a photographic array whom she believed could have been the shooter; one of the men was the defendant.

Lee testified that he heard the gunshot, saw Williams on the ground, and then saw the defendant "eye to eye" from a distance of five or six feet in the well-lighted area. Although the defendant had a gold bandana over the lower part of his face, he still wore the multi-colored sweater and dark pants. Lee pursued the defendant and exchanged gunshots with him before the defendant drove from the scene in the same vehicle he had been using throughout the evening. Lee later identified the defendant from a photographic array, specifically pointing to his "lazy" or "droopy" eyes, and he testified that he had "no doubt" that the defendant was the shooter and the man he had chased from the scene.

Williams was given CPR at the scene and then transported to the hospital. The gunshot to his neck had transected his spine, resulting in paralysis and an inability to breathe. Williams was placed on an artificial ventilator and contracted pneumonia and other infections. He died on January 29, 1998.

After the shooting, on December 26, 1997, the defendant went to Stephon Spencer's house and told him, "They said I shot a police officer." Thereafter the defendant telephoned his parents and two lawyers, but then left Spencer's home. On December 27, 1997, police officers found the defendant at a Memphis apartment. Later that day, officers found the defendant's hat, sweater, vest, and vehicle license plate inside his girlfriend's house. Ballistics tests later revealed particles of gunshot residue on the defendant's vest.

Although the defendant did not introduce any evidence at trial, he challenged the identification testimony of Lee and Jeltz[2] and attempted to develop an alibi defense. The jury, however, convicted the defendant of the first degree premeditated murder of Donald Williams and the attempted second degree murder of Frank Lee.

**Sentencing Phase**

After the conviction of McKinney for the premeditated first degree murder of Donald Williams, the trial moved into the sentencing phase for the offense. In sentencing, the State relied upon the aggravating circumstance in Tenn. Code Ann. § 39-13-204(i)(2) (1997), *i.e.*, that the defendant had a prior conviction for a felony whose statutory elements involved the use of violence to a person. The State introduced evidence to show that the defendant had pled guilty to aggravated robbery on May 1, 1994 in Memphis, Tennessee.

The offense of aggravated robbery, in pertinent part, is the intentional or knowing theft of property from the person of another by violence or putting the person in fear, accomplished with a deadly weapon or by display of any article used or fashioned to lead the victim to reasonably believe it to be a deadly weapon. See Tenn. Code Ann. § 39-13-402(a) (1997). The indictment to which the defendant pled guilty had charged that the defendant and a co-defendant "violently" robbed the victim.

In addition to evidence of the prior violent felony aggravating circumstance, the State presented victim impact evidence. First, the victim's widow, Sharon Williams, testified that the personal and financial loss suffered by her and her two daughters had been "devastating." The children were eight and ten years of age when the victim was killed.

Memphis police officer Michael J. Clark then testified about the victim's career as a police officer from 1982 until his death. Clark said that Williams spent most of his career in uniform patrol and had served as interim vice-president of the Memphis Police Association. Clark also said that Williams was a member of the association's negotiating teams, and he described Williams as a "mediator," rather than a "big, let's lock 'em up, policeman." Clark told the jury that Williams had worked to obtain a school security assignment, which required a four-year college degree.

The defense then presented the testimony of numerous family members and friends who described the defendant's background and characteristics. For example, Tawanda Waterman testified that she was pregnant with the defendant's child in December of 1997, but had lost the child. Waterman said that the defendant had intended to marry her and "start his life over."

The defendant's mother, Ella Tyrus, testified that she was fifteen when she gave birth to the defendant. She said that the defendant was a good artist and was good at helping old people, and she

---

[2] The defendant has not challenged the sufficiency of the evidence supporting the convictions in this Court.

-4-

asked the jury to spare his life. The defendant's stepfather, J.C. Tyrus, testified that the defendant, one of thirteen children, was a normal boy who had caused no problems and who got along well with his siblings. Tyrus said that the defendant had dropped out of school in the eighth or ninth grade, but was a good artist. When Tyrus also stated that the defendant had been trying to turn his life around, the prosecutor cross-examined him about the defendant's juvenile adjudications for aggravated assault in 1991.

Steven and Linda Moshier testified that they were friends and co-workers of the defendant and that the defendant was a good worker. Linda Moshier stated that the defendant was great with children and avoided confrontations. Zacharias Stewart, a childhood friend, also testified that the defendant had a great personality and introduced a drawing that the defendant had done.

Dr. John V. Ciocca, a clinical psychologist, testified that he interviewed the defendant and reviewed his school records. Dr. Ciocca said that the defendant had low learning ability in reading, writing, and mathematics. The defendant had a "low average" IQ in the lower 90s and had been placed in special education when he was nine. According to Dr. Ciocca, the defendant's learning disability, lethargy, and despondency at a young age revealed a need for psychological help that he never received. The defendant was expelled from school in the ninth grade, but later completed the requirements for a G.E.D. in 1994.

The defendant then took the stand and testified that he was the father of two children, both of whom had died. He also said that he had learning problems in school and got bored easily. The defendant admitted that he had been drinking and smoking marijuana on the day of the offenses, but he denied that he killed Donald Williams and accused the State's witnesses of lying. Although the defendant admitted that he served time for aggravated robbery, he said that he had only driven a getaway car while a co-defendant committed the robbery. The defendant testified that he attained his G.E.D. while he was in prison in 1994. He admitted that he had juvenile adjudications for aggravated assault, but minimized his role in those incidents.

After the evidence was completed, the case was submitted to the jury for sentencing. The jury found that the defendant's prior conviction for aggravated robbery satisfied the aggravating circumstance relied upon by the State, see Tenn. Code Ann. § 39-13-204(i)(2) (1997), and that the evidence of this aggravating circumstance outweighed evidence of mitigating circumstances beyond a reasonable doubt. Accordingly, the jury imposed the death sentence upon Timothy McKinney for the first degree murder of Donald Williams. The defendant appealed to the Court of Criminal Appeals, which affirmed the conviction and the death sentence. Thereafter, the case was automatically docketed in this Court.

## ANALYSIS
### Eyewitness Identification

The first issue raised by the defendant and selected for oral argument by this Court is the issue of whether expert proof may be introduced regarding eyewitness identification. The defendant

argues that the trial court erred in denying his motion to permit expert testimony regarding eyewitness identifications and that the exclusion of this evidence denied his due process right to a fair opportunity to present a defense during the guilt phase of the trial. The State responds that this Court has held that expert testimony regarding eyewitness identifications is inadmissible and that the exclusion of such evidence does not violate a defendant's due process right to present a defense.

The State is correct that a majority of this Court has ruled that expert testimony on the issue of eyewitness identifications is *per se* inadmissible under Tenn. R. Evid. 702. State v. Coley, 32 S.W.3d 831 (Tenn. 2000).[3] The Coley majority reasoned as follows:

> Eyewitness testimony has no scientific or technical underpinnings which would be outside the common understanding of the jury; therefore, expert testimony is not necessary to help jurors 'understand' the eyewitness's testimony. Moreover, expert testimony about the eyewitness's accuracy does not aid the jury in determining a fact in issue because the question whether an eyewitness should be believed is not a 'fact in issue' but rather a credibility determination.

Id. at 833-34. The Court therefore concluded that "general and unparticularized expert testimony concerning the reliability of eyewitness testimony, which is not specific to the witness whose testimony is in question, does not substantially assist the trier of fact" as required by Tenn. R. Evid. 702. Id. at 838.[4]

Although conceding that Coley is controlling on the issue of admissibility under Tenn. R. Evid. 702, the defendant argues that the exclusion of such evidence violated his due process right to a fair opportunity to present a defense. In addressing and rejecting this identical due process argument in Coley, however, the Court considered (1) whether the excluded evidence was critical to the defense; (2) whether the evidence was sufficiently reliable for admission; and (3) whether the interest supporting exclusion of the evidence was substantially important. The Court concluded that the expert testimony on eyewitness identification was not critical to the defense and that the due process right was not violated. See State v. Coley, 32 S.W.3d at 838 n.14.

---

[3] Justice Holder, joined by then Chief Justice Anderson, dissented from the adoption of a *per se* rule of exclusion in Coley and would have remanded the case for a hearing on admissibility. Although Justices Holder and Anderson adhere to their dissenting view expressed in Coley, they agree with the result in the present case given the defendant's failure to make an offer of proof as to what the proposed expert testimony would have shown. See State v. Sims, 45 S.W.3d 1, 15 (Tenn. 2001).

[4] The defendant's reliance upon State v. Dyle, 899 S.W.2d 607 (Tenn. 1995), is clearly misplaced. In Dyle, this Court described identification testimony as an expression of belief or impression and adopted an enhanced jury instruction to be used in cases where identification is a material issue. 899 S.W.2d at 612. The majority in Coley specifically relied upon Dyle, and the enhanced jury instruction on eyewitness testimony, in support of the *per se* rule of exclusion. See State v. Coley, 32 S.W.3d at 837.

In the present case, the defendant did not make a specific offer of proof as to the nature of the proposed expert testimony and the need for such testimony in this case. See Tenn. R. Evid. 103(a)(2). The defendant's motion was accompanied only by articles from secondary sources regarding eyewitness identification and a copy of a motion for expert testimony that had apparently been used in an unrelated case. In short, the defendant failed to show whether the proposed evidence was critical to the defense and whether it was sufficiently reliable for admission. The defendant also failed to address whether a substantially important interest existed for the exclusion of such evidence. See State v. Coley, 32 S.W.3d at 838 n.14; see also State v. Brown, 29 S.W.3d 427, 433-34 (Tenn. 2000). Accordingly, the defendant is entitled to no relief on the basis of due process.

### Aggravating Circumstance Jury Verdict Form

The next issue raised by the defendant is whether the jury's verdict form was sufficiently clear to demonstrate that the jury found that the aggravating circumstance of a prior violent felony applied. The State relied upon a single aggravating circumstance in seeking the death penalty, *i.e.*, that the defendant had a prior conviction for a felony whose statutory elements involved the use of violence to the person. See Tenn. Code Ann. § 39-13-204(i)(2) (1997). The State specifically relied upon the defendant's 1994 conviction for the offense of aggravated robbery.

The trial court instructed the jury on the precise statutory language of this aggravating circumstance and then added that "[t]he state is relying upon the crime of aggravated robbery, which is a felony involving the use of violence to the person." In imposing the death penalty, the jury's verdict read in part: "We, the jury, unanimously find the following listed statutory aggravating circumstance or circumstances: aggravated robbery."

The defendant argues that the jury returned an incomplete and erroneous verdict because it did not recite the aggravating circumstance verbatim and did not set out specifically the facts constituting the aggravating circumstance. The State argues that the jury's verdict was sufficiently clear to show that it found the elements of the aggravating circumstance relied upon by the State.[5]

This Court has never held that the jury's verdict must be a verbatim statement of the aggravating circumstance relied upon by the State. See State v. Bland, 958 S.W.2d 651, 661 n.6 (Tenn. 1997) ("The failure of the verdict to repeat the language of the statute defining the aggravating circumstance does not invalidate the jury's findings."). Although a verbatim statement may be the preferred practice, the verdict must be sufficiently clear to indicate that the jury has found the elements of the aggravated circumstance or circumstances relied upon by the prosecution. If the jury has returned an incorrect or imperfect verdict, the "trial court has both the power and the duty to redirect the jury's attention to the law and return them to the jury room with directions to reconsider their verdict." State v. Harris, 989 S.W.2d 307, 314 n.7 (Tenn. 1999). The jury's finding

---

[5] The State also correctly argues that the issue was waived because the defense did not object to the verdict form at trial and did not list the issue in his motion for a new trial. Although we agree with the State, we elect to reach and review the merits of the issue to clarify the law in this regard.

is nonetheless sufficient where "the aggravating circumstances found are clearly those allowed by the statute and permit effective appellate review of the sentence." State v. Teel, 793 S.W.2d 236, 250 (Tenn. 1990); see also State v. Bland, 958 S.W.2d at 661 n.6.

We agree with the Court of Criminal Appeals' conclusion that the verdict in this case was sufficiently clear to indicate that the jury found the aggravating circumstance relied upon by the State, *i.e.*, that the defendant had a prior conviction for a felony whose statutory elements involved the use of violence to a person. See Tenn. Code Ann. § 39-13-204(i)(2) (1997). The State relied upon – and the jury was instructed upon – only one aggravating circumstance. The trial court's instruction tracked the statutory language of the aggravating circumstance and then identified the State's reliance on the offense of aggravated robbery. The jury's verdict specifically cited the prior offense of aggravated robbery, which was relied upon by the State and was part of the trial court's instruction. Under the circumstances, we conclude that the jury's verdict form sufficiently demonstrated that the jury found the aggravating circumstance relied upon by the State.

The defendant's reliance upon State v. Harris, 989 S.W.2d 307 (Tenn. 1999), is misplaced. In Harris, which was a life without parole case, this Court held that a sentencing verdict was erroneous where the jury found that "'the murder was especially heinous and atrocious.'" 989 S.W.2d at 314.[6] The statements of the jury foreperson, however, revealed that the jury intended to omit the remaining critical language of the aggravating circumstance, *i.e.*, "torture or serious physical abuse beyond that necessary to produce death." Id. Under those circumstances, it was clear that the verdict was incomplete and erroneous and that the only issue for consideration was whether the error was harmless beyond a reasonable doubt. See id.

As the Court of Criminal Appeals observed, the decisions in State v. Carter, 988 S.W.2d 145 (Tenn. 1999), and State v. Stephenson, 878 S.W.2d 530 (Tenn. 1994), are likewise of no assistance to the defendant. In both Carter and Stephenson, the jury's verdicts were facially void because the jury had not been instructed under the law applicable at the time of the offense and the verdict did not comply with that sentencing law. Moreover, the errors revealed that the jury may not have applied the proper standard of proof, *i.e.*, "beyond a reasonable doubt," with regard to whether the aggravating circumstances had been proven and whether the aggravating circumstances outweighed mitigating factors. State v. Carter, 988 S.W.2d at 152; State v. Stephenson, 878 S.W.2d at 555. Unlike these cases, it is clear that the trial court in the case before us instructed the jury under the law in effect at the time of the offenses. Accordingly, the defendant is not entitled to relief based on this issue.

## Sufficiency of Aggravating Circumstance

---

[6]    The aggravating circumstance relied upon by the State in Harris required a finding that the "murder was especially heinous, atrocious, or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death." See Tenn. Code Ann. § 39-13-204(i)(5) (1997).

The defendant argues that the evidence was insufficient to support the jury's finding of the aggravating circumstance set forth in Tenn. Code Ann. § 39-13-204(i)(2), because there was no evidence that his prior conviction for aggravated robbery involved violence to the person.[7] The State maintains that the defendant's argument is contrary to the plain meaning of the aggravating circumstance, which requires only that the "statutory elements" of the offense "involve the use of violence to the person." The State also argues that the defendant's argument is factually unsupported given that he pled guilty in 1994 upon an indictment alleging that he and a co-defendant "violently" robbed a victim.

This Court has held that a conviction for robbery supported the prior violent felony aggravating circumstance in that the offense, "by definition, [was] the felonious and forcible taking from the person of another, goods or money of any value, by violence or by putting the person in fear." State v. Taylor, 771 S.W.2d 387, 398 (Tenn. 1989) (discussing prior definition of robbery under Tenn. Code Ann. § 39-2-501 (1982) (citations omitted)). The Court reasoned that the "fear constituting an element of robbery is a fear of bodily injury and of present personal peril from violence offered or impending." Id. (citation omitted).

Our decision in Taylor does not necessarily control the present case, however, inasmuch as the aggravating circumstance at that time required that the prior felony conviction involved the use or the threat of violence to the person. See id. at 398; see also Tenn. Code Ann. § 39-2-203(i)(2) (1982). In contrast, as we have already noted, the current version of the aggravating circumstance requires that the "statutory elements" of the prior felony involve the "use of violence to the person." See Tenn. Code Ann. § 39-13-204(i)(2) (1997).

The critical issue therefore is whether the statutory elements of aggravated robbery involve the use of violence to the person by definition. We have observed in this regard that the offense of robbery may be committed by "violence" or by "putting the person in fear." See State v. Fitz, 19 S.W.3d 213, 214 (Tenn. 2000); see also Tenn. Code Ann. § 39-13-401(a) (1997). In Fitz, we applied the plain meaning of "violence" as "physical force unlawfully exercised so as to injure, damage or abuse." See State v. Fritz, 19 S.W.3d at 216. Although we then recognized that the evidence in most cases will satisfy both "violence" and "putting the victim in fear," our analysis revealed that there are two separate prongs by which the offense can be established. Id. at 215-217.

We recently reached a similar conclusion in holding that pointing a gun at a victim during a robbery constitutes violence in State v. Allen, ___ S.W.3d ___ (Tenn. 2002):

---

[7] The offense of robbery is "the intentional or knowing theft of property from the person of another by violence or putting the person in fear." Tenn. Code Ann. § 39-13-401(a) (1997). The offense of aggravated robbery is a robbery "[a]ccomplished with a deadly weapon or by display of any article used or fashioned to lead the victim to reasonably believe it to be a deadly weapon" or "where the victim suffers serious bodily injury." Tenn. Code Ann. § 39-13-402(a) (1997).

-9-

As demonstrated by decisions from other jurisdictions, the elements of "violence" and "putting the person in fear" are not mutually exclusive. . . . We recognized in Fitz that some conduct may constitute both violence and putting the person in fear. Pointing a gun at a victim meets both definitions. This construction of the term "violence" does not render meaningless the concept of "putting the person in fear." There remain purely verbal threats and conduct not rising to the level of violence that would place a person in fear. Similarly, conduct that is unperceived by a victim, such as striking a victim from behind to render that victim unconscious, would constitute "violence" but may be insufficient to place that person in fear.

Id. at ___ (citations omitted). In short, our decisions in Fitz and Allen reveal that the offense of robbery is not limited by definition to the use of violence to the person.

The offense of aggravated robbery, however, is a robbery "accomplished with a deadly weapon or by display of any article used or fashioned to lead the victim to reasonably believe it to be a deadly weapon" or "where the victim suffers serious bodily injury." Tenn. Code Ann. § 39-13-402 (1997). As we have said, our decisions reveal that the use of a deadly weapon, such as pointing a gun at the victim, constitutes violence, see State v. Allen, ___ S.W.3d at ___, and the use of physical force causing injury to the victim likewise constitutes violence, State v. Fitz, 19 S.W.3d at 216. While these definitions suggest that the large majority of aggravated robberies involve violence, we recognize that the offense may also be committed with an "article used or fashioned to lead the victim to reasonably believe it to be a deadly weapon." This statutory provision thus raises the question of whether an offense of aggravated robbery committed in this manner constitutes violence. See State v. Allen, ___ S.W.3d at ___ ("There remain purely verbal threats and conduct not rising to the level of violence that would place a person in fear.").

We need not determine the issue in this case, however, because we have already developed an appropriate analytical framework in State v. Sims, 45 S.W.3d 1 (Tenn. 2001). In Sims, we considered the issue of whether the defendant's prior convictions for aggravated assault[8] were sufficient to support the prior violent felony aggravating circumstance in Tenn. Code Ann. § 39-13-204(i)(2), and we adopted the following approach:

In determining whether the statutory elements of a prior felony conviction involve the use of violence against the person for purposes of § 39-13-204(i)(2), we hold that the trial judge must necessarily examine the facts underlying the prior felony if the statutory elements

---

[8] The offense of aggravated assault as relevant in Sims consisted of "intentionally or knowingly causing the victim to reasonably fear imminent bodily injury by use or display of a deadly weapon." See Tenn. Code Ann. § 39-13-101(a)(1) (1997).

-10-

of that felony may be satisfied either with or without proof of violence. To hold otherwise would yield an absurd result . . . .

State v. Sims, 45 S.W.3d at 11-12. We held that the trial court had properly determined that the prior violent felony aggravating circumstance was applicable where the defendant's aggravated assault convictions were based on his shooting of two victims. Id. at 11-12.

Here, the defendant testified during sentencing that he did not participate in the aggravated robbery that served as the basis of the aggravating circumstance. The defendant admitted, however, that his co-defendant was armed with a weapon and that he waited in the getaway car while the co-defendant carried out the robbery. See State v. Allen, ___ S.W.3d at ___. Moreover, as the State observes, the defendant pled guilty to an indictment alleging that he and his co-defendant "violently by the use of a deadly weapon" robbed the victim. See Tenn. Code Ann. § 39-13-401 (1997). This Court has frequently held that the entry of an informed and counseled guilty plea constitutes an admission of all of the facts and elements necessary to sustain a conviction and a waiver of any non-jurisdictional defects or constitutional irregularities. See State v. Carter, 988 S.W.2d at 148; State v. Pettus, 986 S.W.2d 540, 542 (Tenn. 1999). Accordingly, we agree with the Court of Criminal Appeals' conclusion that the evidence supported the jury's finding of the prior violent felony aggravating circumstance.

### Residual Doubt Argument

The defendant argues that the trial court erred in refusing to allow references to testimony elicited during the guilt phase of the trial during defense counsel's closing argument in the sentencing phase. Specifically, the defendant contends that because the State argued that gunshot residue found on his vest conflicted with his testimony during the sentencing phase, defense counsel should have been allowed to argue that evidence in the guilt phase disputed whether the perpetrator had been wearing a vest.[9] The State concedes that the trial court erred in refusing to allow defense counsel's argument, but it maintains that the error was harmless.

"Residual doubt evidence," in general, may consist of proof admitted during the sentencing phase that indicates the defendant did not commit the offense, notwithstanding the jury's verdict following the guilt phase. State v. Hartman, 42 S.W.3d 44, 55-56 (Tenn. 2001). This Court has recently held that under Tennessee law, a defendant is allowed "to present evidence at a re-sentencing hearing to establish residual doubt as a nonstatutory mitigating circumstance." Id. at 55 (citation omitted). While Hartman had not been decided at the time of the trial in this case, the decision relied in part upon statutory provisions governing evidence that may be considered in sentencing:

---

[9] For instance, Frank Lee testified that the shooter had not been wearing a vest and Joyce Jeltz did not mention whether the shooter wore a vest in her original statement to police.

In the sentencing proceeding, evidence may be presented as to any matter that the court deems relevant to the punishment and may include, but not be limited to, the nature and circumstance of the crime; the defendant's character, background history, and physical condition; any evidence tending to establish or rebut the aggravating circumstances enumerated . . . ; and any evidence tending to establish or rebut any mitigating factors.

Tenn. Code Ann. § 39-13-204(c) (1997). Moreover, the Court also relied upon the following rationale:

[T]he defendant has the right to present at the sentencing hearing, whether by the jury which heard the guilt phase or by a jury on re-sentencing, evidence relating to the circumstances of the crime or the aggravating or mitigating circumstances, including evidence which may mitigate his culpability.

State v. Hartman, 42 S.W.3d at 56 (quoting State v. Teague, 897 S.W.2d 248, 256 (Tenn. 1995)).

As the Court of Criminal Appeals observed, however, this case is not squarely on all fours with either Hartman or Teague. In Hartman, for example, the defendant sought to introduce evidence at a resentencing proceeding indicating that the prosecutor had purchased the testimony of a key witness at the original trial. 42 S.W.3d at 55. In Teague, the defendant tried to introduce evidence of an alibi at a resentencing proceeding. 897 S.W.2d at 256.

In contrast, the present case does not involve a resentencing procedure, nor does it involve a defendant's effort to introduce evidence of residual doubt. Instead, the defendant only sought to argue evidence that had already been admitted by the trial court and heard by the same jury in the guilt phase of the trial. As the State concedes, however, this does not mean that the rationale underlying Hartman and Teague is inapplicable. Our decision in Teague specifically included cases in which the sentencing jury is the same jury that heard the evidence at the guilt phase. See 897 S.W.2d at 256.[10] Moreover, as we said in Hartman:

While . . . not all impeachment proof will be relevant to show residual doubt, it does not logically follow that impeachment proof will never be relevant to establish residual doubt about the defendant's guilt. Where . . . the proffered residual doubt proof is impeachment of the testimony of the only witness who offered direct rather than circumstantial proof of the defendant's involvement in the crime,

_____

[10] We recognized in Hartman, however, that most cases involving evidence of residual doubt will involve resentencing proceedings. 42 S.W.3d at 57-58.

-12-

such proof clearly is relevant and admissible to establish residual
doubt as a mitigating circumstance.

42 S.W.3d at 57.

An argument during sentencing that refers to evidence from the guilt phase is not improper simply because it has the effect of alluding to residual doubt. As we have long held, the manner and conduct of closing argument by the parties is left to the discretion of the trial court. State v. Bigbee, 885 S.W.2d 797, 809 (Tenn.1994). Accordingly, where a defendant seeks to argue residual doubt based on the evidence introduced or in response to an argument made by the prosecution, the trial court should exercise its discretion by resolving any doubt in favor of the defendant's argument. See Hartman, 42 S.W.3d at 58 ("doubts about the admissibility of reliable proof relevant to show residual doubt should be resolved in favor of admissibility").

In this case, the defendant's proposed argument was based on the evidence, *i.e.*, the testimony of witnesses Lee and Jeltz with regard to whether the defendant had been wearing a vest. Moreover, it was in fair response to the prosecutor's argument that the defendant's testimony that he was not the shooter had not been credible because gunshot residue had been found on the defendant's vest. The trial court therefore erred by refusing to allow the argument simply because it had the effect of alluding to residual or lingering doubt.

The trial court's error, however, does not require a new sentencing proceeding. First, the proposed argument did not have the substance or weight of the evidence of prosecutorial misconduct and alibi defense sought to be introduced and argued in Hartman and Teague, respectively. Moreover, given that this was not a resentencing hearing, the reality is that the sentencing jury had already heard the testimony underlying defense counsel's proposed argument and had reconciled it in favor of the State's theory of guilt and against the defendant's theory of innocence. Thus, the argument was of dubious value either as residual doubt or in mitigation. Finally, the aggravating circumstance found by the jury was strongly supported by the defendant's prior conviction for aggravated robbery. In sum, the defendant has not shown that the trial court's error affected the jury's verdict to his prejudice, and therefore the error was harmless.

**Victim Impact Evidence**

The defendant argues that the trial court erred by allowing the State to introduce the testimony of a Memphis police officer as victim impact evidence during the sentencing phase of the trial. Officer Michael Clark testified that the victim, Donald Williams, had been a Memphis police officer since 1982, and he described many of Williams' duties and activities as a police officer. The State maintains that the evidence was properly introduced and was accompanied by the appropriate limiting instructions from the trial court.

The introduction of "victim impact" evidence and prosecutorial argument is not precluded by either the United States Constitution or the Tennessee Constitution in a capital sentencing

proceeding.  See Payne v. Tennessee, 501 U.S. 808, 827, 111 S. Ct. 2597, 2609, 115 L. Ed. 2d 720 (1991); State v. Nesbit, 978 S.W.2d 872, 889 (Tenn. 1998).  As the United States Supreme Court has explained:

> We are now of the view that a State may properly conclude that for the jury to assess meaningfully the defendant's moral culpability and blameworthiness, it should have before it at the sentencing phase evidence of the specific harm caused by the defendant.  "[T]he State has a legitimate interest in counteracting the mitigating evidence which the defendant is entitled to put in, by reminding the sentencer that just as the murderer should be considered as an individual, so too the victim is an individual whose death represents a unique loss to society and in particular to his family."

Payne v. Tennessee, 501 U.S. at 825, 111 S. Ct. at 2608 (alteration in original) (emphasis added) (citation omitted).

This Court has provided guidance on the nature and extent of evidence that may be introduced under the theory of "victim impact" evidence:

> Generally, victim impact evidence should be limited to information designed to show those unique characteristics which provide a brief glimpse into the life of the individual who has been killed, the contemporaneous and prospective circumstances surrounding the individual's death, and how those circumstances financially, emotionally, psychologically or physically impacted upon members of the victim's immediate family.

State v. Nesbit, 978 S.W.2d at 891 (citations omitted).  There is no "bright-line test, and the admissibility of specific types of victim impact evidence must be determined on a case-by-case basis."  Id.  We have cautioned, however, that such evidence, and prosecutorial argument based on the evidence, should be closely scrutinized and restrained so as not to be unduly prejudicial or appeal to the emotions or sympathies of the jury.  Id. at 891-92; see also State v. Smith, 993 S.W.2d 6, 14 (Tenn. 1999); State v. Burns, 979 S.W.2d 276, 282 (Tenn. 1998).

The defendant correctly observes that the statutory provision on the issue of victim impact evidence limits such evidence to the testimony of members of the victim's family:

> The court may permit a member or members, or a representative or representatives of the victim's family to testify at the sentencing

-14-

> hearing about the victim and about the impact of the murder on the
> family of the victim and other relevant persons.

Tenn. Code Ann. § 39-13-204(c) (1997).

The principles outlined in the above case law, however, are not categorically restrictive. In Nesbit, for example, we identified three types of victim impact evidence: (1) information designed to provide a "brief glimpse" into the life of the victim; (2) the contemporaneous and prospective circumstances surrounding the victim's death; and (3) the financial, emotional, psychological, and physical effects on the victim's family. State v. Nesbit, 978 S.W.2d at 891; see also Payne v. Tennessee, 501 U.S. at 825, 111 S. Ct. at 2608 ("the victim is an individual whose death represents a unique loss to society and in particular to his family."). The statutory provision essentially identifies the third of these categories. See Tenn. Code Ann. § 39-13-204(c) (1997). We therefore agree with the Court of Criminal Appeals' conclusion that the statute does not expressly restrict or limit the introduction of other types of victim impact evidence authorized by law developed in our prior cases.

In this case, Officer Clark related factual information about the victim's career as a police officer, including his duties, functions, and type of work. Clark described the victim's role as a police officer as a "mediator." Clark's testimony was limited to factual background – he did not testify about the effect of the victim's death on himself, other officers, society, or the Memphis Police Department. Accordingly, we agree with the Court of Criminal Appeals' conclusion that Officer Clark's testimony was limited to providing a "brief glimpse" into the life of the victim and that such a glimpse did not violate the defendant's right to due process or equal protection.

The defendant also argues, however, that allowing Clark's testimony was unduly prejudicial in that it emphasized the victim's status as a police officer and thereby permitted the jury to consider an additional aggravating circumstance that was not applicable under the facts of this case. See Tenn. Code Ann. § 39-13-204(i)(9) (1997) (aggravating circumstance if the victim is a law enforcement officer killed while on duty).[11] The defendant further asserts that the evidence was used improperly in the State's closing arguments:

> [The victim] was a giant in our community. [The defendant] took
> him from us. He took him from his family, from his co-workers.
> This community is less of a place now, because Don Williams isn't
> here anymore.

---

[11]     The defendant also argues that the error was magnified by the prosecutor's reference to the defendant's juvenile adjudications for aggravated assault, which apparently involved police officers. As the Court of Criminal Appeals held, however, the evidence was used to impeach witnesses who had testified about the defendant's character.

You heard the testimony about his family life, about his professional life, what type of law enforcement officer he was. This is not about vengeance. It is about justice.

We agree with the defendant that there was a potential risk that Clark's testimony could have been considered by the jury as evidence of an additional aggravating circumstance that was not relied upon by the State or applicable to the facts of this case. The record reflects, however, that both the State and the trial court took reasonable steps to reduce or eliminate the risk. For example, the State did not argue that the evidence constituted an additional aggravating circumstance; indeed, on several occasions, the prosecutor told the jury that it was relying on a single aggravating circumstance, *i.e.*, the defendant's prior violent felony conviction. The prosecutor's argument also reminded jurors that "victim impact evidence cannot and should not be confused with the aggravating circumstance."

Similarly, the trial court charged the jury on only one aggravating circumstance, *i.e.*, the defendant's prior conviction for a felony whose statutory elements involved violence to the person. Moreover, the trial court gave the jury the limiting instruction this Court formulated in Nesbit, which advises the jury of the following: (1) that the jury may not consider victim impact evidence as an aggravating circumstance; (2) that the jury may not consider victim impact evidence unless it first finds that one or more aggravating circumstances have been established beyond a reasonable doubt; and (3) that the jury may not consider victim impact evidence unless it first finds that the evidence of aggravating circumstances outweighs evidence of mitigating factors beyond a reasonable doubt. See 978 S.W.2d at 892. The jury is presumed to have followed these instructions. See State v. Keen, 31 S.W.3d 196, 232 (Tenn. 2000).

Accordingly, we conclude that the trial court did not abuse its discretion in allowing the testimony of Officer Clark to be considered by the jury as victim impact evidence during the sentencing phase of the proceeding.

**Proportionality**

Where a defendant has been sentenced to death, we must apply a comparative proportionality analysis pursuant to Tenn. Code Ann. § 39-13-206(c)(1) (1997 & Supp. 2001). The analysis identifies aberrant, arbitrary, or capricious sentencing by determining whether the death sentence is "disproportionate to the punishment imposed on others convicted of the same crime." State v. Bland, 958 S.W.2d at 662 (quoting Pulley v. Harris, 465 U.S. 37, 42-43, 104 S. Ct. 871, 875, 79 L. Ed. 2d 29 (1984)).

In conducting this analysis, this Court employs the precedent seeking method of comparative proportionality review, in which we compare a case with cases involving similar defendants and similar crimes. State v. Bland, 958 S.W.2d at 667. While no defendants or crimes are precisely alike, a death sentence is disproportionate if a case is "plainly lacking in circumstances consistent with those in cases where the death penalty has been imposed." Id. at 668.

We have repeatedly held that the pool of cases considered by this Court in its proportionality review includes those first degree murder cases in which the State seeks the death penalty, a capital sentencing hearing is held, and the sentencing jury determines whether the sentence should be life imprisonment, life imprisonment without the possibility of parole, or death. State v. Godsey, 60 S.W.3d 759, 783 (Tenn. 2001). Although the dissent argues that the pool should include all first degree murder cases, we recently explained that the pool does not include first degree murder cases in which a plea bargain is reached with respect to the punishment or in which the State does not seek the death penalty:

> [C]onsideration of cases in which the State, for whatever reasons, did not seek the death penalty would necessarily require us to scrutinize what is ultimately a discretionary prosecutorial decision. . . . We previously have declined to review the exercise of prosecutorial discretion . . . , and it would be particularly inappropriate to do so in conducting comparative proportionality review, where our function is limited to identifying aberrant death sentences, not identifying *potential* capital cases . . . . Such a course could potentially discourage the State both from exercising its discretion to not seek the death penalty and from engaging in plea bargaining with a defendant charged with first degree murder. Indeed, such a course could result in the State seeking the ultimate penalty in every first degree murder case.

Id. at 784 (citations omitted).[12]

Accordingly, our comparative proportionality review of the applicable pool of cases considers numerous factors regarding the offense: (1) the means of death; (2) the manner of death; (3) the motivation for the killing; (4) the place of death; (5) the victim's age, physical condition, and psychological condition; (6) the absence or presence of premeditation; (7) the absence or presence of provocation; (8) the absence or presence of justification; and (9) the injury to and effect upon non-decedent victims. We also consider numerous factors about the defendant: (1) prior criminal record, if any; (2) age, race, and gender; (3) mental, emotional, and physical condition; (4) role in the murder; (5) cooperation with authorities; (6) level of remorse; (7) knowledge of the victim's helplessness; and (8) potential for rehabilitation. State v. Bland, 958 S.W.2d at 668; see also State v. Bane, 57 S.W.3d 411, 428-29 (Tenn. 2001).

The circumstances of this case reveal that the defendant, Timothy McKinney, was attending a party at a club in Memphis, Tennessee. Upon leaving the club, the defendant became extremely upset because he could not find his car in the parking lot. One witness described him as drunk. He

---

[12] Given our detailed and considered treatment of this issue, the dissent's assertion that our review "ignored" the first degree murder cases cited in the dissent in which the State did not seek the death penalty is unfounded.

rebuked the victim's efforts to assure him that his car was still in the lot, and he immediately threatened to "come back and shoot up the club or blow it up." The defendant had to be separated from the officer who later became his victim, yet threatened that he would "be back."

The defendant left the scene, only to return on two occasions. After his second return, he was detained by Memphis police officer Ronald Marshall and again told to leave the area. Despite these warnings and an ample time for "cooling off," the defendant returned a third time and shot the unarmed victim in the back of the neck from close range. The defendant's threats, his repeated departures and reappearances at the scene, and the passage of time overwhelmingly supported the jury's finding that the killing was intentional and premeditated. Moreover, neither the defendant's anger regarding the whereabouts of his car nor his anger toward the victim provided any provocation or justification for returning to the scene and shooting the unarmed victim.

The defendant was 23 years of age at the time of the offense. He had a prior conviction for aggravated robbery as an adult and adjudications for aggravated assault as a juvenile. The defendant was told to leave the club several times and had ample time to cool off; yet he kept returning and ultimately shot the unarmed victim at close range. The defendant made no claim that he was too impaired to act with intent and premeditation, although he had been drinking and smoking marijuana on the day of the murder. The defendant introduced mitigating evidence about his family background, personality, and learning disabilities. There was no evidence, however, that the defendant had a physical, mental, or emotional condition that impaired his judgment or conduct in any manner. Moreover, the defendant did not turn himself in after the offense, cooperate with authorities, or express any remorse for the offense. Accordingly, the evidence regarding the defendant's potential for rehabilitation was dubious at best.

This Court has upheld the death penalty in numerous first degree murder cases involving similar shooting offenses. In State v. Sims, the defendant, acting alone, was convicted of premeditated murder for burglarizing the victim's home and shooting the victim in the back of the head without provocation or justification. 45 S.W.3d at 19. In State v. Henderson, the defendant was convicted for premeditated murder after shooting a deputy sheriff in the head at close range. 24 S.W.3d 307, 313 (Tenn. 2000). In State v. Bland, the defendant was convicted of premeditated murder for pursuing and shooting the unarmed victim. 958 S.W.2d at 670; see also State v. Stout, 46 S.W.3d 689, 707 (Tenn. 2001) (defendant was convicted of felony murder for kidnapping a victim and shooting her once in the back of the head without provocation or justification); State v. Smith, 993 S.W.2d 6, 11 (Tenn. 1999) (defendant was convicted of felony murder after shooting an unarmed victim in the head without provocation or justification); State v. Cribbs, 964 S.W.2d 773 (Tenn. 1998) (defendant shot victim in the head during a robbery); State v. Harris, 839 S.W.2d 54 (Tenn. 1982) (the defendant shot a hotel security guard).

The Court has upheld the death penalty in numerous cases in which one of the aggravating circumstances was a prior violent felony whose statutory elements involved the use of violence to the person, see Tenn. Code Ann. § 39-13-204(i)(2) (1997), including many cases in which the prior violent felony was similar to the defendant's prior conviction for aggravated robbery. See State v.

Stout, 46 S.W.3d at 707 (especially aggravated robbery); State v. Sims, 45 S.W.3d at 19 (aggravated assault); State v. Chalmers, 28 S.W.3d 913, 919 (Tenn. 2000) (attempted especially aggravated robbery and attempted first degree murder); State v. Cribbs, 967 S.W.2d at 790 (attempted second degree murder, aggravated robbery, and second degree murder); State v. Taylor, 771 S.W.2d 387, 398 (Tenn. 1989) (robbery); State v. Harries, 657 S.W.2d 414, 421 (Tenn. 1983) (armed robbery and kidnapping). Moreover, this Court has upheld the death penalty in several cases in which the prior violent felony was the sole aggravating circumstance relied upon by the jury. See State v. Chalmers, 28 S.W.3d at 919; State v. Keough, 18 S.W.3d 175, 184 (Tenn. 2000); State v. Smith, 993 S.W.2d at 19; State v. Adkins, 725 S.W.2d 660, 662 (Tenn. 1987). Indeed, the prior violent felony factor is an aggravating circumstance that this Court has described as "more qualitatively persuasive and objectively reliable than others." State v. Howell, 868 S.W.2d 238, 261 (Tenn. 1993).

Finally, this Court has upheld the death penalty in several cases in which the defendant was approximately the same age or presented similar or even stronger mitigating evidence. See, e.g., State v. Stout, 46 S.W.3d at 708; State v. Chalmers, 28 S.W.3d at 919-20; State v. Henderson, 24 S.W.3d at 318; State v. Smith, 993 S.W.2d at 19; State v. Bland, 958 S.W.2d at 670.

Notwithstanding the above analysis, the dissent argues that the death sentence is disproportionate because the facts and circumstances in this case are not as severe as those in the cases we have considered and are more similar to first degree murder cases in which the defendant received a life sentence. We believe that the dissent's arguments are misplaced and unfounded.

Although we recognize and have considered that there are first degree murder cases in the applicable pool[13] in which the defendant received a sentence less than death, see State v. Overbay, 874 S.W.2d 645 (Tenn. Crim. App. 1993); State v. Welch, 836 S.W.2d 586 (Tenn. Crim. App. 1992); State v. Bell, 690 S.W.2d 879 (Tenn. Crim. App. 1985), our analysis does not require a determination of whether a given case is subjectively "more or less" like other "death" cases or other "life" cases. Instead, our review requires that we identify aberrant death sentences by determining whether a case "plainly lacks" circumstances found in similar cases in which the death penalty has been imposed. See State v. Godsey, 60 S.W.3d at 787 (finding death sentence disproportionate). As we have explained, the facts and circumstances regarding this offense and this defendant reveal that this case does not plainly lack circumstances consistent with those in the numerous similar cases in which a death sentence has been upheld. Accordingly, the death sentence is not arbitrary or disproportionate as applied in this case.

**CONCLUSION**

For all of the foregoing reasons we conclude as follows: (1) the trial court did not commit error by denying the defendant's motion to introduce expert testimony on the issue of eyewitness

---

[13] For the reasons previously explained, we do not consider the cases cited by the dissent that are not in the applicable pool.

-19-

identifications; (2) the jury's verdict form was sufficiently clear to demonstrate that the jury found the prior violent felony aggravating circumstance relied upon by the prosecution; (3) the evidence was sufficient to sustain the prior violent felony aggravating circumstance found by the jury; (4) the trial court's refusal to allow defense counsel to refer to evidence from the guilt phase of the trial during his closing argument in the sentencing phase of the trial did not affect the jury's determination to the prejudice of the defendant and was harmless error; (5) the trial court did not commit error in admitting victim impact evidence during the sentencing phase; and (6) the sentence of death was neither arbitrary nor disproportionate.

We also conclude that the evidence was sufficient to support the jury's findings that the aggravating circumstance had been established beyond a reasonable doubt and that the aggravating circumstance outweighed evidence of mitigating factors beyond a reasonable doubt. See Tenn. Code Ann. § 39-13-206 (1997 & Supp. 2001). Finally, we agree with the Court of Criminal Appeals' conclusions with respect to the remaining issues, the relevant portions of which are included in the appendix to this opinion.

Accordingly, we affirm the judgment of the Court of Criminal Appeals and set the date of execution for the 26th day of July, 2002. As it appears that the defendant is indigent, the costs are assessed to the State of Tennessee.

_____
E. RILEY ANDERSON, JUSTICE

# APPENDIX

## (Excerpts from the Court of Criminal Appeals' Decision)

# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### November 7, 2000 Session

## STATE OF TENNESSEE v. TIMOTHY MCKINNEY

**Appeal from the Criminal Court for Shelby County**
**Nos. 98-01434, 98-01435     Joseph B. Dailey, Judge**

---

**No. W1999-00844-CCA-R3-DD  - Filed March 28, 2001**

---

We affirm the defendant's convictions of first degree murder and attempted second degree murder and the death sentence imposed on the murder charge, despite the defendant's claims that: (1) the trial court erroneously disallowed expert testimony on the reliability of eyewitness identification; (2) the jury's capital sentencing verdict was infirm; (3) the trial court erroneously allowed the impeachment of a defense character witness during the penalty phase of the trial; (4) the trial court erred in allowing victim impact evidence that related to the impact of the victim's death on persons or institutions other than the victim's family; (5) the trial court erroneously limited the defendant's argument to the jury during the penalty phase; (6) cumulative errors require reversal of the death sentence; (7) the Tennessee death penalty statute is, for various reasons, unconstitutional. We find no error and hold that the death penalty in this case was proportionate to the death penalty imposed in similar cases, the sentence was not arbitrarily imposed, and the evidence supports the jury's finding of a statutory aggravating circumstance and its finding that the aggravating circumstance outweighs any mitigating circumstances. *See* Tenn. Code Ann. § 39-13-206(c)(1) (1997).

### Tenn. R. App. P. 3; Convictions and Sentence of Death Affirmed.

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which DAVID H. WELLES and THOMAS T. WOODALL, JJ., joined.

William Gosnell, Memphis, TN (Trial & Appeal);William D. Massey, Memphis, TN (Appeal), for the Appellant, Timothy McKinney.

Michael E. Moore, Solicitor General; Kathy Morante, Deputy Attorney General; William L. Gibbons, District Attorney General; Phillip Gerald Harris and David Henry, Assistant District Attorneys General, for the Appellee, State of Tennessee.

### OPINION

**[Deleted:  Summary of Facts and Testimony]**

# I.

## [Deleted:  Eyewitness Expert Testimony]

# II.

## [Deleted:  Jury Verdict Form]

# III.

## [Impeachment - Juvenile Adjudication]

In his third issue, the defendant argues that the trial court erred by permitting the state to attempt to use his juvenile adjudication for aggravated assault to impeach the testimony of his step-father, J.C. Tyus.

At sentencing, the defendant's step-father, J.C. Tyus, testified on the defendant's behalf. His testimony reflected that he had been married to the defendant's mother over twenty-five years and was the only father the defendant had ever known.  Tyus testified that as a small child, the defendant "wasn't a real rowdy son . . . [h]e wasn't really running around like a rowdy son he was just like any other children, you know, but he really wasn't bad, or nothing like that."  Tyus also stated that the defendant "wouldn't get real angry, but if he gets angry he wasn't, like no violence."  Tyus denied that the defendant had any outbursts or discipline problems while living at home.

Prior to cross-examination, the state sought permission at a bench conference to impeach Mr. Tyus.  The state argued that Tyus was portrayed by the defense as a someone who knew the defendant well and who characterized the defendant as a peaceful, non-violent individual.  In its proffer, the state submitted a copy of the juvenile court record reflecting the defendant's April 1991 guilty plea in juvenile court to aggravated assault.  The trial court granted the state permission to use the adjudication for impeachment purposes.

On cross-examination, Mr. Tyus reiterated that the defendant did not have any problems with anger or violence growing up.  In response to the state's queries regarding the defendant's April 1991 juvenile adjudication, Tyus denied knowing that the defendant was involved in a drive-by shooting or that he had leveled and fired a shotgun at the arresting officers.  The state, however, did not attempt to prove the aggravated assault adjudication.  Actual evidence of the prior offense was not admitted into evidence until the defendant testified about it on direct examination later in the penalty phase.

The defendant argues that the trial court erred in allowing cross-examination about his juvenile adjudication to impeach Tyus and in failing to give a limiting instruction to the jury that the evidence was introduced for impeachment purposes only.  The state counters that the trial court properly followed the dictates of *State v. Nesbit*, 978 S.W.2d 872 (Tenn. 1998), in permitting Tyus' impeachment,

and while conceding that the trial court erred by failing to give a limiting instruction, the state asserts that the error was harmless.

Evidence Rule 405 governs the impeachment of character witnesses. Tenn. R. Evid. 405. It provides that in "cases in which evidence of character or a trait of character of a person is admissible, proof may be made by testimony as to reputation or by testimony in the form of an opinion," but it requires adherence to specific procedures and conditions before cross-examination inquiry may be made "into relevant specific instances of conduct." *Id.* First, counsel must apply to the court before introducing a specific instance of conduct to impeach a character witness; second, the trial court must conduct a hearing to determine the relevancy of the proposed inquiry; third, the trial court must determine a reasonable factual basis for the inquiry exists; and fourth, the trial court must determine that the probative value of the instance of conduct outweighs its prejudicial effect. *Nesbit*, 978 S.W.2d at 881-83. In addition to these Rule 405-based requirements, our supreme court has said that the trial court must instruct the jury "that the specific acts of conduct were admitted for the limited purpose of evaluating the credibility of the character witness." *Id*. at 883.

At this juncture, we recognize that there are two different trial court actions being challenged here. The Rule 405 requirements for cross-examining a character witness about specific instances of misconduct are designed to assure that the *cross-examination* is itself acceptable and not necessarily to assure that *evidence* is acceptable. *See* Tenn. R. Evid. 405(a) (establishing conditions for "allowing inquiry on cross-examination about specific instances of conduct"). On the other hand, *Nesbit* requires that the trial court must instruct the jury "that the specific acts of conduct *were admitted* for the limited purpose of evaluating the credibility of the character witness." *Nesbit*, 978 S.W.2d at 883 (emphasis added). This requirement is geared to addressing the jury's use of admitted evidence. *See* Tenn. R. Evid. 405, Advisory Comm'n Comments.

First, we consider the decision to allow the impeachment. Prior to cross-examination, the state sought permission to introduce evidence of that specific instance of the defendant's conduct in order to demonstrate the fallibility of Mr. Tyus' opinion, and the trial court conducted a bench conference outside the jury's hearing. *See* Tenn. R. Evid. 405(a)(1). The state presented a copy of the defendant's juvenile court adjudication for aggravated assault which unequivocally established a "reasonable factual basis" for the specific instance of conduct to be used for impeachment. *See Nesbit*, 978 S.W.2d at 883. The trial court considered the basis for the state's request and then permitted use of the adjudication on the basis that it showed bias by the witness and knowledge (or lack thereof) of the defendant and his activities. Although not explicitly finding that the probative value of the evidence outweighed its prejudicial effect, the court implicitly determined that probative value outweighed prejudice. This determination is amply supported by the record. *Id.* The decision to allow the impeaching cross-examination was not erroneous.

Now we must determine whether the failure to give a limiting instruction was error. We note that, in *Nesbit*, the evidence was admitted into evidence when the cross-examined character witness acknowledged hearing about tales of Nesbit's misconduct. *Id.* at 884. In the present case, however, the character witness did not admit knowing that the defendant had assaulted an officer or had received a juvenile adjudication resulting from this assault, nor did the state introduce independent proof of the assault

-3-

or resulting adjudication.[14]   Under these circumstances, we question, therefore, whether the *Nesbit* requirement of a limiting instruction is implicated.  Nevertheless, we recognize that the cross-examination raised the specter of the defendant's prior commission of aggravated assault, and we will review the effect of the trial court's failure to give a limiting instruction as if the evidence was introduced.  *See* Tenn. R. Evid. 405, Advisory Comm'n Comments (implying that mere cross-examination about "rumors," as opposed to the witness acknowledging the "rumors," may require the limiting instruction).

In our view, if the failure to give the limiting instruction was error, it was harmless.  *See* Tenn. R. Crim. P. 52(a).  Evidence of the defendant's prior aggravated assault was substantively admissible to contradict the defendant's temperate nature, a material fact shown by the character witnesses.  When "fact contradiction" involves controverting the testimony of a witness, it is sometimes viewed as a process of witness impeachment.  *See* N. Cohen, *et al.*, Tennessee Law of Evidence, § 6.07[4], at 6-57 through -62 (4th ed. 2000).  In a broader sense, however, when evidence contradicts material, adjudicative facts, the real efficacy of the evidence is substantive fact rebuttal that *incidentally* impeaches a fact or fact witness.  *See* *State v. Electroplating, Inc.*, 990 S.W.2d 211, 231, n.17 (Tenn. Crim. App. 1998).  In other words, when "fact contradiction" evidence is relevant to the issues on trial, it is generally admissible as substantive evidence.  *Id.*; *see* Tenn. R. Evid. 402.  Thus, when Mr. Tyus testified about the defendant's youthful normalcy and peacefulness, the state's cross-examination of him can be viewed not only as a challenge to his efficacy as a character witness, but as a contradiction of the asserted fact.  Even though the state may have been required to "take" Tyus' answer as a function of impeachment, we believe that the evidence would logically have been probative on the issue of the defendant's peaceful deportment as a teenager and could have been independently presented.  For all we know, the state only declined to present it in rebuttal when the defendant himself presented the evidence on direct examination.  Moreover, had the character witness acknowledged the defendant's prior offense or adjudication, the evidence would have functioned substantially, in which event no limiting instruction would have been necessary.

To reach the conclusion that the defendant's juvenile aggravated assault is relevant to issues on trial in the sentencing phase of the present capital case, we need only look to Tennessee Code Annotated section 39-13-204(c), which provides:

> In the sentencing proceeding, evidence may be presented as to any matter that the court deems relevant to the punishment and may include . . . the defendant's character, background history, and physical condition; any evidence tending to establish or rebut the aggravating circumstances enumerated in subsection (i); and any evidence tending to establish or rebut any mitigating factors.

Tenn. Code Ann. § 39-13-204(c) (Supp. 2000).

In addition to the character testimony of J.C. Tyus, the defense presented the testimony of three other witnesses at the sentencing phase in an effort to convey to the jury a sense of the defendant's

---

[14] As an exercise in witness impeachment, the state may have been limited to "taking the witness's answer." If so, it could not have offered independent evidence of the aggravated assault or the resulting adjudication.  N. Cohen, *et al.*, Tennessee Law of Evidence, § 4.05[4][d], at 4-108 (4th ed. 2000).

non-violent and non-confrontational character.[15]   Plainly, the testimony of these witnesses was offered to present non-statutory mitigation evidence of the defendant's peaceful nature.  Evidence of his previous juvenile court adjudication of aggravated assault would logically serve to rebut that non-statutory mitigation evidence.  *See id.; State v. Vincent C. Sims*, No. W1998-000634-CCA-R3-DD, slip op. at 24 (Tenn. Crim. App., Jackson, Mar. 14, 2000) (testimony of defendant's relatives that he was not an aggressive person opened the door to state's cross examination about defendant's prior convictions; evidence was admissible under § 39-13-204(c) to rebut mitigating circumstances).  As such, the evidence that was suggested in the course of Mr. Tyus' cross-examination, had it been introduced by the state, would have been admissible as substantive evidence in rebuttal or, in other words, to contradict mitigating evidence.  If it can be said that the trial court erred in not giving the instruction, in view of the evidence being "suggested" but not "introduced" as to the substantive issue, then surely the error is harmless.

The harmlessness of any error is further illustrated by pointing out again that it was the defendant himself who actually introduced *evidence* of his juvenile court adjudication of aggravated assault.  On direct examination during the sentencing phase, he admitted this adjudication.  It may well be that the defense intended to steal the state's impeachment thunder by admitting the adjudication, and to that end, the defense may have intended that the use of this direct-testimony evidence would be limited to impeachment purposes.  We observe, however, that the state would not have been permitted to use the adjudication to impeach the defendant.  *See* Tenn. R. Evid. 609(d) ("Evidence of juvenile adjudications is generally not admissible under this rule.").  Moreover, the defendant apparently made no request for limiting instructions.  All in all, we conclude that, especially in the absence of a request for a limiting instruction, the evidence introduced by the defendant was available for unrestricted use by the jury.  *See State v. Smith*, 24 S.W.3d 274, 279-80 (Tenn. 2000). Thus, for this additional reason, we conclude that the trial court did not err when it failed to give the limiting instruction mandated by *Nesbit*.

As an adjunct to his argument that the trial court erred in failing to give a limiting instruction, the defendant also claims that the prosecution engaged in misconduct by arguing in closing that the conviction was substantive evidence of a pattern of conduct by the defendant which justified imposition of the death penalty.  In light of our conclusion that the evidence was admissible substantively, this claim fails to discredit the sentence.

---

[15]  Tawanda Waterman, the defendant's girlfriend, testified that the defendant treated her "real nice, respect [sic]" and that she never witnessed him get angry.

Linda Moshier, the wife of the defendant's former work supervisor, testified that she and her husband developed a friendship with the defendant and that she never witnessed any angry outbursts or problems with the defendant.  Moshier also testified that she had "seen him several times just step away from people who wanted to start problems with him" and that "[the defendant] indicated . . . that he did not want trouble in his life, he had been down that road."

Zacharias Stewart testified that he had known the defendant for eighteen years and that they had grown up in the same church.  The defense introduced a drawing given to Stewart by the defendant which Stewart described as representing "that after he was finished with his time [the defendant] was looking to do . . . good and better things." Stewart stated that "[the defendant] had a great personality . . . all through the years that we went to church together we kind of had a tight bond . . . he was like a brother to me."  On cross-examination, the witness agreed that his and the defendant's church did not teach violence as a way to resolve conflict and that assassination or vindictive behavior is against the teachings of the church.

IV.

**[Deleted:  Victim Impact Testimony]**

V.

**[Deleted:  Residual Doubt Argument]**

VI.

**[Cumulative Effect of Errors]**

In his sixth issue, the defendant complains that the cumulative effect of all errors at trial violated due process and his right to a constitutionally reliable, non-arbitrary sentencing determination. We have examined, however, all issues raised by defendant and find no more than a single error, and we have ruled above in section III that the single error, if any, is harmless.  There are no errors to accumulate.

VII.

**[Unanimous Jury Verdict]**

In his seventh issue, the defendant argues that requiring the jury to unanimously agree on a life sentence and prohibiting informing the jury of the consequences of a non-unanimous verdict violated his constitutional rights pursuant to *McKoy v. North Carolina*, 494 U.S. 433, 110 S. Ct. 1227 (1990), and *Mills v. Maryland*, 486 U.S. 367, 108 S. Ct. 1860 (1988).  "In *McKoy* and *Mills*, the Court held that sentencing schemes that permit jurors to consider only unanimously found mitigating circumstances in determining whether the aggravating circumstances are sufficient to justify imposition of death penalty impermissibly limit the jurors' consideration of mitigating evidence in violation of the Eighth Amendment." *State v. Hall*, 8 S.W.3d 593, 602 (Tenn. 1999).

The trial court's jury instructions in this case with regard to imposition of a life sentence tracked Code section 39-13-204(f).  Subsections (f)(1) and (2) specify in pertinent part,

> (1)   If the jury unanimously determines that no statutory aggravating circumstance has been proven by the state beyond a reasonable doubt, the sentence shall be imprisonment for life.
>         . . .
> (2)   If the jury unanimously determines that a statutory aggravating circumstance or circumstances have been proven by the state beyond a reasonable doubt, but that such circumstance or circumstances have not been proven by the state to outweigh any mitigating circumstance or circumstances beyond a reasonable doubt, the jury shall, in its considered discretion, sentence the defendant either to imprisonment for life without possibility of parole or imprisonment for life.

Tenn. Code Ann. § 39-13-204(f)(1), (2) (Supp. 2000).

As best we can discern, the defendant actually presents three familiar issues regarding the constitutionality of Tennessee's death penalty scheme. He attacks the requirements (1) that a life sentence be based upon a unanimous verdict; (2) that the jury be deprived of knowledge that a life sentence would be the result of a non-unanimous verdict, *see* Tenn. Code Ann. § 39-13-204(h) (Supp. 2000); and (3) that a finding that aggravating circumstances do not outweigh mitigating circumstances be based upon a unanimous verdict.

These arguments have been rejected by the Tennessee Supreme Court. *See State v. Cribbs*, 967 S.W.2d 773, 796 (Tenn. 1998); *State v. Hall*, 958 S.W.2d 679, 718 (Tenn. 1997); *State v. Brimmer*, 876 S.W.2d 75, 87 (Tenn. 1994) (cases rejecting attack based upon requirement of unanimity of life-sentence verdict). *See also Cribbs*, 967 S.W.2d at 796; *Brimmer*, 876 S.W.2d at 87 (cases rejecting claim that jury should be informed of effect of non-unanimous verdict). *See also State v. Smith*, 893 S.W.2d 908, 926 (Tenn. 1994); *State v. Nichols*, 877 S.W.2d 722, 735 (Tenn. 1994) (cases rejecting attack upon requirement of unanimity of finding that aggravating circumstances do not outweigh mitigating circumstances). They avail the defendant no relief.

VIII.

**[Prosecutorial Discretion]**

In his eighth issue, the defendant argues that the unlimited discretion vested in the District Attorneys General whether to seek the death penalty violates his Eighth and Fourteenth Amendment constitutional rights.

This argument has been repeatedly rejected by the Tennessee Supreme Court. *See, e.g., State v. Smith*, 993 S.W.2d 6, 27 (Tenn. 1999) (affirming this court's conclusion that "[p]rosecutorial discretion used in selecting candidates for the death penalty does not result in any constitutional deprivation"); *State v. Cazes*, 875 S.W.2d 253, 268 (Tenn. 1994); *State v. Brimmer*, 876 S.W.2d 75, 86-87 (Tenn. 1994).

IX.

**[Discriminatory Imposition of Death Penalty]**

In his ninth issue, the defendant charges that the discriminatory imposition of the death penalty, based upon race, geography and gender, violates his constitutional rights under the Eighth and Fourteenth Amendments.

Again, this argument has been rejected repeatedly by the Tennessee Supreme Court. *See, e.g., State v. Cazes*, 875 S.W.2d 253, 268 (Tenn. 1994); *State v. Brimmer*, 876 S.W.2d 75, 87, n. 5 (Tenn. 1994); *State v. Smith*, 857 S.W.2d 1, 23 (Tenn. 1993).

X.
**[Deleted: Proportionality]**

## CONCLUSION

Based upon the foregoing, the judgment of the trial court and the sentence of death imposed by the jury in the above-captioned case is AFFIRMED.

_____
JAMES CURWOOD WITT, JR., JUDGE

H:\OPINIONS\Current\mckinneyt.opn