# IN THE SUPREME COURT OF TENNESSEE
## AT JACKSON
### February 3, 2005 Session Heard at Nashville

## STATE OF TENNESSEE  v.  STEVEN RAY THACKER

**Automatic Appeal from the Court of Criminal Appeals**
**Circuit Courts for Dyer and Lake Counties**
Dyer County No. C00-54; Lake County No. 01-CR-8238     Hon. R. Lee Moore, Jr., Judge

---

### No. W2002-01119-SC-DDT-DD - Filed April 27, 2005

---

A jury convicted the defendant, Steven Ray Thacker, of first degree murder.  Following a capital sentencing hearing, the jury found two aggravating circumstances: (1) the murder was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or prosecution of the defendant; and (2) the murder was knowingly committed by the defendant while the defendant had a substantial role in committing, or was fleeing after having a substantial role in committing, a first degree murder, rape, robbery, burglary, theft or kidnapping.  Tenn. Code Ann. § 39-13-204(i)(6), (7) (1997).  The jury also found that these aggravating circumstances outweighed the mitigating circumstances beyond a reasonable doubt.  Accordingly, the jury imposed a sentence of death.  The Court of Criminal Appeals affirmed both the conviction and sentence.

Upon automatic appeal pursuant to Tennessee Code Annotated section 39-13-206 (2003) this Court entered an order specifying five issues for oral argument,[1] including (1) whether the evidence is sufficient to support the conviction; (2) whether the trial court erred in limiting the testimony of Dr. Keith Caruso, a forensic psychiatrist, at the sentencing hearing; (3) whether the trial court committed reversible error when it refused to instruct on the defendant's "history of abuse and neglect" as a non-statutory mitigating circumstance; (4) whether the State improperly relied upon aggravating circumstance (i)(6) to support the death penalty; and (5) whether the death sentence is comparatively proportionate and valid under the mandatory review provisions of Tennessee Code Annotated section 39-13-206(c)(1)(A)-(D) (2003).  After a careful review of the record and relevant legal authority, we affirm the judgment of the Court of Criminal Appeals.

### Tenn. Code Ann. § 39-13-206(a)(1);
### Judgment of the Court of Criminal Appeals Affirmed

---

[1]  "Prior to the setting of oral argument, the Court shall review the record and briefs and consider all errors assigned.  The Court may enter an order designating those issues it wishes addressed at oral argument."  Tenn. Sup. Ct. R. 12.2.

WILLIAM M. BARKER, J., delivered the opinion of the court, in which FRANK F. DROWOTA, III, C.J., and E. RILEY ANDERSON and JANICE M. HOLDER, JJ., joined. ADOLPHO A. BIRCH, Jr., J. filed a concurring and dissenting opinion.

Charles S. Kelly, Sr., Charles S. Kelly, Jr., and Wayne Emmons, Dyersburg, Tennessee, for the appellant, Steven Ray Thacker.

Paul G. Summers, Attorney General and Reporter; Michael E. Moore, Solicitor General; Angele M. Gregory and Gill Robert Geldreich, Assistant Attorneys General, for the appellee, State of Tennessee.

## OPINION

## I. Background

## A. Guilt Phase

The defendant, Steven Ray Thacker, was convicted of first degree premeditated murder and felony murder for the death of Ray Patterson.[2] The State's proof at trial established that on January 2, 2000, an automobile being driven by the defendant broke down just east of the Mississippi River as he was traveling from Springfield, Missouri towards Dyersburg, Tennessee. The defendant received a ride from an unidentified male to the Northside Truck Stop in Dyersburg. The defendant asked the cashier at the truck stop, Melissa Atkeson, if she knew of a wrecker service that was open on Sundays. Atkeson provided the defendant with the name and telephone number of Ray Patterson, a local wrecker operator. The defendant called Patterson and then waited at the truck stop until the wrecker arrived.

Elizabeth Patterson, the victim's wife, remembered her husband receiving a telephone call at home on the morning of January 2, 2000. After taking the call, Patterson wrote "Oldsmobile Cutlass, '85, pull to Auto Zone store" on an envelope, then told his wife to continue on to church with their children and he would join them later if possible. When the victim left home that morning, he carried a .25 caliber semi-automatic pistol in his pocket, which, according to Ms. Patterson, was not unusual for her husband to do when answering calls for a wrecker. He also carried a pocket knife, his wallet, money, and a pack of cigars.

Curtis Hinson, an employee of Triple-A Taxi in Dyersburg, saw the victim and another man in the victim's wrecker that morning. As Mr. Hinson was traveling on Lake Road, the victim's wrecker passed by, traveling in the opposite direction. Hinson observed that the victim was driving, another man was riding as a passenger, and the wrecker was towing a vehicle. Also that morning, a maintenance worker at the Dyersburg welcome center, Thomas Burns, saw the victim accompanied

---

[2] The convictions were subsequently merged into a single conviction.

by another man at the welcome center. Later that afternoon, Burns learned that Mr. Patterson had been killed, and he saw the defendant's picture in the newspaper. Burns recognized the defendant as the same man he had seen with Mr. Patterson at the welcome center that morning.

Wyman Brasfield, a wrecker driver for Brasfield Body Shop, passed by Patterson Brothers' Service Station during the morning of January 2, 2000 and noticed the victim standing inside the building with his back to the window. Brasfield also noticed another person, whom he could not identify, standing inside the building with the victim. The victim's wrecker, with a car attached to it, was parked outside on the station lot. Later that day, Mr. Brasfield received a call to tow a vehicle at the residence of Tim Capps, a local mechanic. Upon arriving at Capps' residence, Brasfield recognized the vehicle to be towed as the same one that had been hooked to the Patterson wrecker earlier in the day. The defendant later admitted to police that he had traded vehicles at Mr. Capps' repair shop on that day.

Kenneth Campbell and Emily Guinn had been on their way to church the morning of January 2, 2000, when they stopped at Patterson Brothers' Service Station to buy a drink. When Mr. Campbell got out of his vehicle he noticed a person walking towards him but thought nothing of it. However, as he was attempting to get a soda from the drink machine, he saw the victim lying on the ground between the gas pumps and the office. Mr. Campbell immediately got back into his vehicle and left to find a telephone and call the police. He circled the block and, as he neared the service station again, he noticed "someone dragging the body near the roll-up door of the gas station." Mr. Campbell then drove directly to the police station to report what he had seen.

Tina Canada, the manager of B&B Market at Big Boy Junction in Dyersburg, recalled that on that same Sunday morning, a man came into the store to purchase antifreeze. The man asked an elderly gentleman in the store, Sam Brown, whether there was an outside water faucet. He also asked Mr. Brown for directions to Auto Zone and then left the store, heading back toward town. According to Ms. Canada, the man was calm and "just concerned about getting his car fixed." She could not, however, identify the defendant as being the man in the store.

At approximately 12:20 p.m. that day, the defendant entered the Auto Zone in Dyersburg and approached a customer in the store, Mr. Paul Gage. The defendant asked Mr. Gage if he knew of "a place to get a car worked on." Mr. Gage referred him to Tim Capps and told the defendant that Capps' repair shop was located behind Webb's Used Cars. The defendant, in a statement later given to police, described how he drove from Auto Zone to Capps' shop. When he was informed that it would take several days to repair his vehicle, the defendant traded his vehicle to Capps for a red Chevrolet Camaro. However, the Camaro had mechanical problems, so the defendant returned it in exchange for a Pontiac 6000.

By this time, police had discovered the victim's body at Patterson Brothers' Service Station and had begun their investigation. Officer David Fisher of the Dyersburg Police Department was the first officer on the scene. Officer Fisher discovered the victim lying in the first service bay of the service station. A trail of blood led from the first fuel pump island directly to the body.

According to Officer Fisher, the victim was dressed in an "ordinary service-station-type uniform" and "his inner shirt was torn, and the jacket and shirt, around the collar area, was pulled backwards, as if he'd been dragged to the location that he was found." Officer Fisher also observed a "substantial" wound to the victim's upper torso.

Two EMT's with the Dyersburg Fire Department, Jerry Walker and Ronnie Collins, arrived at the scene shortly thereafter. Mr. Walker examined the victim for vital signs but found none. Upon opening the victim's shirt, he observed a wound "in his shoulder, coming down, it looked like. It looked like a knife wound." No other wounds were discovered by Walker. A paramedic at the scene, Tony Douglas, also examined the victim and discovered "a puncture wound on the right side of the chest somewhere around two to three inches long and in a moon-shape." Mr. Douglas believed that this wound was fatal and that the victim had died from "bleeding out" because "he'd lost a lot of blood." He found no other wounds on the victim. Mr. Douglas admitted, however, that he did not know for certain the cause of death.

Investigator Jim Joyner was the first detective to arrive at the service station. He observed a very large amount of blood at the scene, recalling that "blood was all over the station, out in the front, in the service bay, in the office" and the victim's clothing was "saturated with blood." Additionally, there was a large blood spatter from the cash register to the wall of the office. Investigator Joyner stated that the blood trail went out the door of the office toward the service bay door. A Discover credit card in the name of Forrest R. Boyd was found on the counter next to the credit card machine. Neither the victim's gun nor his wallet were found, and the Patterson wrecker was missing from the service station.

Following up on the Discover credit card found at the scene of the crime, investigators contacted the Sheriff's Department in Polk County, Missouri. They were able to verify that the person who owned the card, Forrest Boyd, was a resident of Polk County and was not in Dyer County, Tennessee. Also, Boyd had not given permission for anyone to possess or use his card in Dyer County. Polk County Sheriff Mike Parson advised the Tennessee investigators that the defendant, Steven Ray Thacker, may have been in possession of the credit card and also Mr. Boyd's vehicle, which Sheriff Parson described as a "1985 Oldsmobile Cutlass, burgundy in color" bearing the license plate number 540JBJ.

After receiving this information pointing to the defendant as a possible suspect, along with a description of the vehicle he might be driving, Investigator Joyner advised other area law enforcement personnel to be on the lookout for the vehicle and the defendant. Later that same day, the Dyer County Sheriff's Department was informed by Tim Capps that the suspect had traded vehicles and was possibly driving a cream colored 1984 Pontiac 6000. The Union City Police Department subsequently located both the vehicle and the suspect at the Super 8 Motel in Union City.

Derrick O'Dell, a patrol officer with the Union City Police Department, responded to information that the suspect vehicle was at the Super 8 Motel. Upon arriving at the motel, Officer

O'Dell observed a white male exiting the building carrying two Wal-Mart bags and walking towards a dumpster. Officer O'Dell approached and questioned the man, who identified himself as "George" and stated that he was from Florida. When a second officer arrived, however, the man was identified as the defendant, Steven Thacker. The officers then transported the defendant to the Obion County Jail.

Investigator Joyner, along with Investigator Monty Essary, searched the defendant's room at the Super 8 Motel pursuant to a warrant. They recovered several items belonging to the victim, including credit cards, a .25 caliber semiautomatic pistol, hair dye, and numerous other items. On the bed, the officers discovered two knives. Also, a green Carhartt coat and a brown coat were seized from the room and sent to the Tennessee Bureau of Investigation (TBI) for analysis. Some of the items found in the room were bloodstained.

Investigator Essary accompanied the victim's body to the Methodist Hospital morgue, where he removed the victim's clothing, including two bloodstained shirts. This clothing was bagged and sent to the TBI Crime Lab for analysis along with a blood sample obtained from the defendant. In addition, investigators located a red Pontiac Firebird at Tim Capps' business that was one of the vehicles the defendant had driven. Inside the Pontiac, investigators found a Buck brand five-and-one-half-inch knife with blood on it. This knife was also forwarded to the TBI Crime Lab. The Crime Lab report subsequently revealed that the DNA obtained from the blood on the victim's shirt matched the DNA from blood found on the knife, the Carhartt coat, and the defendant's boots, which had also been recovered from his hotel room by investigators.

The defendant was taken from the Obion County Jail to the Dyersburg Police Department where, upon being advised of his rights, he voluntarily provided a statement to authorities. In his statement, the defendant detailed his actions leading up to and following the victim's death.

The defendant related how he had left his home in Chouteau, Oklahoma, on about December 28, 1999, and traveled to Springfield, Missouri. He left Springfield on December 31and traveled toward Dyersburg, Tennessee, but his car broke down "two-and-a-half miles this side of the Mississippi River." An unidentified man gave the defendant a ride into Dyersburg and dropped him off at a truck stop. While at this truck stop, the defendant called the victim and asked him to tow his vehicle into the service station. Once they arrived back at the victim's service station, the defendant attempted to pay the victim with the stolen credit card, but the card was rejected. According to the defendant, "he wasn't gonna give my credit -- my card back 'cause I couldn't pay the bill. . . . And I knew I was wanted in other states, so I just stabbed him and took off." He explained that the victim had been facing the credit card machine when the defendant stabbed him but immediately turned around and attempted to pull out his gun. However, the defendant managed to elude him by hiding behind a truck parked inside the garage. The victim then ran out into the parking lot towards the tow truck and collapsed on the ground. At that point, the defendant drove the wrecker off the property and into some nearby woods so he could remove his vehicle from the back of the wrecker. The defendant then returned to the service station, dragged the victim's body back into the building and took the victim's wallet and gun.

The defendant explained how he later traded the Oldsmobile Cutlass that he was originally driving for a red Camaro, but that the Camaro had mechanical problems so he returned it in exchange for the Pontiac 6000. The defendant said that the knife he had used to stab the victim was probably in either the Oldsmobile or the Camaro. Shortly after the murder, the defendant went to a local Wendy's restaurant for a sandwich and then drove to Union City where he checked into the Super 8 Motel. The defendant stated that his plan had been to go camping in the Smoky Mountains, and he admitted to having stolen some camping gear and the knife from Mr. Boyd along with the Oldsmobile.

Based upon the foregoing, the jury found the defendant guilty of first degree premeditated murder and felony murder in perpetration of a theft.

### B. Penalty Phase

During the penalty phase of the trial, Polk County Missouri Sheriff Mike Parson testified that on January 2, 2000, there were warrants outstanding for the arrest of the defendant. Jim Porter, a criminal investigator with the Dyersburg Police Department, recounted how the defendant had stated during questioning that he "knew [he] was wanted in other states, so [he] just stabbed [the victim] and took off."

Elizabeth Patterson, the victim's widow, stated that she and the victim had been married for thirty-five years at the time of his death and that the couple had three adult children. Mrs. Patterson explained that her husband was her sole source of financial support prior to his death. Since his death she had had no income, and was forced to borrow money to pay burial expenses. She had also needed to borrow money to support herself until she received insurance proceeds. She stated, "I lost my best friend and companion. And I can't sleep at night in my bed. I sleep on my couch." She described her husband as "a good man . . . a good Christian man," and related how her husband would sometimes tow vehicles for free. Mrs. Patterson also stated that her husband earned approximately $15,000 per year at the service station and that she had received $250,000 from her husband's life insurance policy.

In mitigation, the defendant offered the testimony of Kimberly Bowen, a resident of Huntington, West Virginia, who lived with the defendant from 1994 until 1997. She described the defendant as follows:

> Steve made me laugh a lot. He was very, very tender with me and my kids. Probably the best example would be when he went into construction and would be gone for a week or two at a time, he would plant notes throughout the house, 'cause he knew that I'd go into the bill drawer to pay bills one day and there'd be a little note letting me know that he missed me, or, you know, in the laundry room. It didn't really matter, you know, just little spots that he would have little notes to remind me of him.

She further described the defendant as selfless and related how he had once aided flood victims in Milton, West Virginia. Ms. Bowen stated that it seemed like the defendant was always "seeking approval." However, she also described periods during which the defendant's behavior changed. According to Bowen, "maybe twenty percent of the time [the defendant] would get revved up and be – he wouldn't be Steve." She recounted how this behavior gradually affected their relationship to the point where she thought they needed to seek help in order to stay together. Thereafter, Ms. Bowen and the defendant went to a mental health facility in Huntington, West Virginia, where the defendant was diagnosed as having bipolar disorder and was prescribed lithium.

Ms. Bowen stated that the medication appeared to work. She recalled, however, one episode of manic behavior by the defendant occurring after he forgot to take his medication while on a trip out of town. According to Ms. Bowen, the defendant "ended up in Columbus, trying to get back, and he kept missing the turnoff on the Columbus loop . . . and he kept going faster and faster. Every time he missed the turnoff, he was going faster. Finally, they stopped him at 140 miles an hour." Ms. Bowen adamantly denied that the defendant used alcohol or illegal drugs or that he ever exhibited any violent behavior. When asked about the murder in Tennessee, Ms. Bowen stated that it was not the act of the Steve Thacker she knew and described it as "[s]o polar opposite. It's frightening."

On cross-examination, Ms. Bowen admitted telling an investigator that the defendant suffered severe mood swings. She explained that the defendant had periods of depression during which he would "get revved up" and exhibit manic behavior. She associated these periods of depression or "revving" as accompanied by spending sprees and "the need for sex." During his "highs," however, the defendant would seek approval from others. Bowen further stated that, at some point, the defendant voluntarily stopped taking his medication. Their relationship eventually ended because, according to Ms. Bowen, "it was a wear on me to always be . . . the stable, you know, home base, if you will. I always felt like I was somehow responsible for Steve's ability or inability to act correctly within society."

Also testifying for the defendant was Crystal St. Clair, a resident of Huntington, West Virginia, who first met the defendant in 1993. Mrs. St. Clair said that the defendant was one of her best friends and described him as "a caring, giving person." She added that "he basically got along with most anyone" and that the defendant would "try to keep trouble down rather than create trouble." Mrs. St. Clair thought highly enough of the defendant to trust him with her children. She acknowledged that when the defendant left West Virginia in 1997, she lost contact with him, although they would "periodically touch base with each other." Mrs. St. Clair also admitted that she was aware of the defendant's bipolar disorder, as well as his decision to stop taking his medication.

Roxanne Evans, the defendant's paternal aunt, also testified for the defendant. She testified that the defendant's father had been in the Air Force and was transferred to Spain when the defendant was two years old. When the defendant was four years old, his parents separated and eventually divorced, and his father gained custody of the defendant and his two sisters. The defendant's father

later remarried, but his new wife had difficulty dealing with the children. Ms. Evans said that on one occasion the children's new step-mother "literally packed their clothes, sat them on the porch, and when my brother came home from work, told him that either the children left, or she left." The defendant and his siblings were taken by their father to their grandparents' home. From that point on, the defendant developed and maintained a close relationship with his grandfather, but he had little contact with his mother.

Ms. Evans recalled that as a child the defendant was quiet and introverted. She added that the defendant was very "affectionate" and that he seemed "hungry for acceptance, hungry for attention." When asked if she had ever seen the defendant exhibit any violent behavior, Ms. Evans answered, "no." She concluded by stating:

> He's a very loving and caring person. He has a problem, and I believe that in a controlled situation that he could live a semi-productive life, and I believe that somehow God could use his talents. He's an extremely gifted artist. I believe that God could use his talents maybe to touch someone somewhere, even if it is in a prison.

The defense then presented Dr. Keith Allen Caruso, a forensic psychiatrist. Dr. Caruso had interviewed the defendant on July 17, 2001 and had also reviewed documents relating to the defendant's case. Based on the information he gathered, Dr. Caruso diagnosed the defendant with a "number of conditions" including bipolar disorder, commonly known as manic depression. Dr. Caruso described this condition as "a mood disorder where someone's emotional state may cycle from depression, where someone's sad . . . very tired . . . unable to sleep and may think about suicide." Dr. Caruso explained that "from a depressive episode, they may cycle up to a manic or hypomanic episode where they're very excitable, . . . irritable, . . . impulsive and not think through the consequences of their actions." A person in this state would, according to Dr. Caruso, "have tremendous amounts of energy and feel very agitated." Their mind would race and "jump from one thought to the next, to the next, to the next." Dr. Caruso added that "someone may cycle between these episodes, and there may be periods, also, in between that they may return to normal functioning."

Dr. Caruso related that the defendant had a history of alcohol dependence but had been in remission while in confinement. The defendant also had a history of drug abuse, but again, had been in remission since going through drug rehabilitation as a teenager. Dr. Caruso further stated that the defendant had a "personality disorder with borderline and antisocial traits." The doctor described persons with this condition as having "problems controlling their behavior and behaving in maladaptive ways." He opined that the defendant's thoughts "particularly around the time of the offense, were more affected by the bipolar disorder." Dr. Caruso stated, "I think this crime was a convergence of many factors. I think that there are some things dating back to Mr. Thacker's childhood that put him on the path that he wound up here today."

Dr. Caruso testified that the defendant's mental condition could be treated with a "mood-

-8-

stabilizing medication like lithium." He was also aware that the defendant had previously been prescribed lithium for his bipolar disorder but had voluntarily stopped taking the medication. According to Dr. Caruso, once the defendant stopped taking the medication he would become ill again, and the cycling of the mood disorder would continue. He concluded that the defendant had been suffering a hypomanic episode at the time of the crime and explained:

> Well, I think that bipolar disorder is the severe mental disease. I think, in addition, there was extreme mental or emotional disturbance. In fact, there were a number of stressors, based on Mr. Thacker's history of abandonment and rejection, would again provoke him into a state of extreme emotional disturbance, in addition to the underlying mental disorder that he has, in addition to the bipolar disorder.

Dr. Caruso further testified that approximately two percent of the United States' population suffers from bipolar disorder. Approximately "two-thirds to three-quarters" of these persons who take mood-stabilizing medication are able to function normally in society. However, Dr. Caruso stated that a major problem with treating bipolar disorder is that the patients are noncompliant with the medication regimen. Dr. Caruso affirmed that the defendant had voluntarily stopped taking his medication because he did not like the effect it had on him.

In Dr. Caruso's opinion, the defendant was competent to stand trial, and a defense of insanity could not be supported in this case. Further, Dr. Caruso stated that he "didn't feel that there was anything here that prevented Mr. Thacker from forming the mens rea for the alleged offenses."

The defendant's inmate records from Riverbend Maximum Security Institution in Nashville were also introduced. These records revealed that the defendant had incurred no disciplinary reports during his two years at that facility awaiting trial.

Following deliberation, the jury found the following aggravating circumstances: (1) the murder was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or prosecution of the defendant; and (2) the murder was knowingly committed by the defendant while the defendant had a substantial role in committing, or was fleeing after having a substantial role in committing, a first degree murder, rape, robbery, burglary, theft or kidnapping. See Tenn. Code Ann. § 39-13-204(i)(6), (7) (1997). The jury also found that these aggravating circumstances outweighed any mitigating circumstances beyond a reasonable doubt. Accordingly, the jury sentenced the defendant to death.

## II. Analysis

### A. Sufficiency of the Evidence

The defendant challenges the sufficiency of the convicting evidence, arguing that there is insufficient evidence as to the cause of the victim's death, insufficient evidence of premeditation,

and insufficient evidence that the murder was committed during the perpetration of a felony.[3] We disagree.

The standard for an appellate court reviewing a sufficiency challenge is "whether, considering the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." State v. Reid, 91 S.W.3d 247, 276 (Tenn. 2002); see also Tenn. R. App. P. 13(e); Jackson v. Virginia, 443 U.S. 307, 319 (1979); State v. Hall, 8 S.W.3d 593, 599 (Tenn. 1999). Because a verdict of guilt removes the presumption of innocence and imposes a presumption of guilt, the burden shifts to the defendant upon conviction to show why the evidence is insufficient to support the verdict. See State v. Evans, 108 S.W.3d 231, 237 (Tenn. 2003); State v. Carruthers, 35 S.W.3d 516, 557-58 (Tenn. 2000); State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). On appeal, the State is entitled to the strongest legitimate view of the evidence and to all reasonable and legitimate inferences that may be drawn therefrom. State v. Smith, 24 S.W.3d 274, 279 (Tenn. 2000); see also Carruthers, 35 S.W.3d at 558; Hall, 8 S.W.3d at 599.

A verdict of guilt by the trier of fact resolves all conflicts in the evidence in favor of the prosecution's theory. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). "Questions about the credibility of witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact, and this Court does not re-weigh or re-evaluate the evidence." Evans, 108 S.W.3d at 236 (citing Bland, 958 S.W.2d at 659). Nor may this Court substitute its own inferences drawn from circumstantial evidence for those drawn by the trier of fact. Evans, 108 S.W.3d at 236-37.

*(1) Evidence as to cause of death*

The defendant contends that there was no credible testimony, either lay or expert, establishing that the victim died as a result of the stabbing.

At trial, the State presented testimony of the two emergency medical technicians (EMTs) and the paramedic who were called to the scene of the crime. One EMT, Jerry Walker, testified that when he arrived at the service station, the victim had no vital signs and appeared to have suffered a wound to his right shoulder. He opined that the victim had died from a knife wound but admitted that he did not know for certain the cause of death. The second EMT, Ronnie Collins, described the knife wound as "a pretty deep gash" and stated that the victim was "soaked in his blood." The paramedic, Tony Douglas, testified that he examined the body and found a moon-shaped puncture wound, two to three inches long, on the right side of the victim's chest. Douglas said that as a paramedic, he would describe the wound as fatal and opined that the victim died from loss of blood,

---

[3] When the jury returns guilty verdicts as to alternative counts of first degree murder, the two verdicts merge into one count of first degree murder. See Carter v. State, 958 S.W.2d 620, 624-25 (Tenn. 1997). A general verdict of guilty is sustainable if any one count in the indictment is supported by proof. See Tenn. Code Ann. § 40-18-111 (1997). Thus, proof of either premeditated murder or felony murder is sufficient to sustain the conviction.

although he admitted that he did not know for certain the cause of death.

Direct expert testimony as to the cause of death is unnecessary. McCord v. State, 278 S.W.2d 689, 690 (Tenn. 1955). Death may be presumed when the defendant's act is proven, the wounds are apparent, and there is no suggestion in the record that the deceased died from any cause other than that relied upon by the State. Id. at 690-91; Bryant v. State, 503 S.W.2d 955, 958 (Tenn. Crim. App. 1973); Franklin v. State, 171 S.W.2d 281, 282 (Tenn. 1943). A non-expert, after describing a wound, may express an opinion that it caused death. See Owens v. State, 308 S.W.2d 423, 424 (Tenn. 1957).

The defendant admitted that he stabbed the victim. There is testimony of extensive bleeding as the result of a deep stab wound that was inflicted just before the victim died, and no evidence that the victim had sustained other injuries. EMT Walker and paramedic Douglas both opined that the stab wound had been fatal. This lay testimony is sufficient to sufficient to support the jury's verdict that the victim died as the result of the stab wound inflicted by the defendant.

### (2) Premeditated murder

The defendant also argues that the evidence fails to prove first degree premeditated murder. He contends that there was insufficient time for premeditation because the stabbing occurred immediately after the victim refused to return the stolen credit card to the defendant.

The defendant was convicted of first degree premeditated murder, defined as "[a] premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202(a)(1) (1997). An act is premeditated if the act is "done after the exercise of reflection and judgment." Id. at (d).

> "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

Id. We have long recognized that premeditation may be proven by circumstantial evidence. See, e.g., State v. Bush, 942 S.W.2d 489, 501 (Tenn. 1997); State v. Brown, 836 S.W.2d 530, 541 (Tenn. 1992). Several circumstances may be considered indicative of premeditation, including: use of a deadly weapon on an unarmed individual; the particular cruelty of the killing; the defendant's threats or declarations of intent to kill; the defendant's procurement of a weapon; making preparations to conceal the crime before the crime is committed; destruction or secretion of evidence of the killing; and a defendant's calmness immediately after the killing. State v. Davidson, 121 S.W.3d 600, 615 (Tenn. 2003); Bland, 958 S.W.2d at 660. Also, the jury may infer premeditation based upon the establishment of a motive for the killing. State v. Sims, 45 S.W.3d 1, 8 (Tenn. 2001).

In the present case, there was sufficient evidence from which the jury could infer premeditation. First, the defendant stated that when he attempted to pay for the wrecker service and the credit card was rejected, he stabbed the victim and left because he "knew [he] was wanted in other states." From these facts the jury could easily and reasonably infer that the moment the credit card was rejected the defendant realized that it would not be long before law enforcement authorities were notified and he would be apprehended for his earlier crimes. This establishes a motive for the killing. The jury could infer that the defendant's motive was to further elude capture by eliminating the victim as a witness. See Sims, 45 S.W.3d at 8 (establishment of a motive as ground for inferring premeditation). Further, the jury could reasonably conclude that the defendant exercised reflection and judgment in forming an intent to kill the victim as soon as the credit card was rejected, but prior to the actual act of killing. See Tenn. Code Ann. § 39-13-202(d) (1997) (act is premeditated if "done after the exercise of reflection and judgment).

Additionally, the defendant's actions after stabbing the victim show that the defendant acted with a cool and calculating demeanor. See Bland, 958 S.W.2d at 660 ("[c]almness immediately following a killing is evidence of a cool, dispassionate, premeditated murder"). Immediately after his attack on the victim, a witness observed the defendant walking in a normal fashion across the parking lot at the scene of the murder. Other witnesses who observed the defendant after the killing described him as behaving normally and calmly. Following the stabbing, the defendant drove the wrecker to a secluded location in order to remove his vehicle from the back of the wrecker. The defendant then returned to the service station, dragged the victim's body out of sight and removed the victim's gun, cash and credit cards. Afterward, the defendant ate a hamburger at a nearby restaurant, conversed with several persons at an Auto Zone store, then to a repair shop where he traded vehicles, and finally checked in to a motel room in Union City.

In sum, there is sufficient evidence of the defendant's motive for the killing and the defendant's conduct and demeanor after the murder to support the jury's finding of premeditation.

### (3) Felony murder

The defendant next argues that there is insufficient evidence to show that the murder was committed in the perpetration of, or during an attempt to perpetrate, a felony because the theft occurred after the murder and was therefore an "afterthought," collateral to the killing.

Felony murder is "[a] killing of another committed in the perpetration of or attempt to perpetrate any . . . theft." Tenn. Code Ann. § 39-13-202(a)(2) (1997). No culpable mental state is required for a felony murder conviction except the intent to commit the underlying felony. See Id. at (b).

The felony murder rule applies when the killing is "done in pursuance of the unlawful act, and not collateral to it." Farmer v. State, 296 S.W.2d 879, 883 (Tenn. 1956). "The killing must have had an intimate relation and close connection with the felony . . . and not be separate, distinct, and independent from it." Id. (quoting Wharton on Homicide, § 126 (3rd ed.)). The killing "may

precede, coincide with, or follow the felony and still be considered as occurring 'in the perpetration of' the felony offense, so long as there is a connection in time, place, and continuity of action." State v. Buggs, 995 S.W.2d 102, 106 (Tenn. 1999). Nevertheless, the "intent to commit the underlying felony must exist prior to or concurrent with the commission of the act causing the death of the victim." Id. at 107. "[A] jury may reasonably infer from a defendant's actions immediately after a killing that the defendant had the intent to commit the felony prior to, or concurrent with, the killing." Id. at 108.

In this case, there is sufficient evidence for a jury to infer that the defendant had the intent to commit the theft at the time of the murder. First, the jury could have rationally inferred that when the victim rejected the stolen credit card, the defendant formed an intent not only to kill the victim, but also to take the victim's property. Second, immediately after the murder, the defendant removed the victim's wrecker from the crime scene to another location, removed his vehicle from the wrecker, and then quickly returned to the crime scene to hide the victim's body and take his personal belongings. Each of these actions was intimately related to the killing, and this entire episode could be viewed as one continuous criminal transaction. Such reasonable inferences are sufficient to justify a finding that the defendant was guilty of felony murder.

### B. Exclusion of Mitigation Evidence as Hearsay

The defendant contends that the trial court erred in ruling that testimony sought from two defense witnesses during the sentencing portion of the trial was inadmissible hearsay. The first instance involved Kim Bowen, who was prepared to testify regarding statements the defendant had made to her about his childhood. Defense counsel asked Ms. Bowen if the defendant had ever spoken to her about his childhood and "the way he was raised." The prosecution objected, arguing that Bowen's response to the question would be hearsay. Defense counsel argued that hearsay may be admitted during the penalty phase of a capital trial if it is being offered as mitigation evidence. The trial court asked defense counsel whether the same information could not be elicited from another witness who had first-hand knowledge. Defense counsel agreed that it could. The trial court then responded, "[l]et's do that. [The State's] objection is sustained."

The prosecution next objected when defense counsel asked the defendant's aunt, Roxanne Evans, whether the defendant's parents were absent from the trial by their own choice. The State objected on the ground that any response would be hearsay, and the trial court sustained the objection. However, a short bench conference was then held out of hearing of the jury. After the conference, the trial court explained to the witness that she could not testify "about what somebody's told you." Defense counsel's questioning was then allowed to resume, at which time, in the presence of the jury, Ms. Evans was asked:

Q:     From what you've observed. Go ahead.

A:     They have chosen not to be here.

Thus, the answer defense counsel sought to elicit from the witness was ultimately admitted. The defendant argues on appeal, however, that by the time the jury heard the answer to the original question, the interruptions caused by the prosecution and the trial court had negated its value. Further, the defendant claims that the trial court's instructions to the witness left her unable to state why the defendant's parents had chosen not to attend the trial.

Tennessee Code Annotated section 39-13-204(c) (1997) provides that, at a capital sentencing hearing, any evidence "which the court deems to have probative value on the issue of punishment may be received regardless of its admissibility under the rules of evidence; provided, that the defendant is accorded a fair opportunity to rebut any hearsay statements so admitted." Therefore, any evidence relevant to the circumstances of the murder, the aggravating circumstances relied upon by the State, or the mitigating circumstances is admissible if such evidence has probative value in the determination of punishment. See State v. Teague, 897 S.W.2d 248, 250 (Tenn. 1995).

Testimony concerning the defendant's estranged relationship with his parents was relevant as mitigating evidence. Exclusion of such mitigating evidence "potentially undermines the reliability of the sentencing determination, and is an error of constitutional magnitude." State v. Cauthern, 967 S.W.2d 726, 739 (Tenn. 1998) (citing Skipper v. South Carolina, 476 U.S. 1, 4 (1986)). The burden thus falls on the State to prove that any error in excluding mitigation evidence did not affect the verdict and was harmless beyond a reasonable doubt. Id. (citing Satterwhite v. Texas, 486 U.S. 249, 258 (1988); Chapman v. California, 386 U.S. 18, 24 (1967)).

A review of the record reveals that the essence of the excluded evidence was ultimately presented to the jury. Defense counsel agreed that the testimony sought from Kim Bowen could be obtained through other witnesses and, in fact, it was brought forth through the testimony of Roxanne Evans. Also, despite the defendant's contentions that its value was lessened due to interruptions by the trial court, the jury was allowed to hear Ms. Evans' statement that the defendant's parents were not at the trial by their own choice. Furthermore, the reason for the parents' absence would have served only as evidence of the strained relationship between the defendant and his parents, and this fact was already before the jury. Accordingly, we conclude that any error in excluding such mitigation evidence did not affect the jury's verdict and was harmless beyond a reasonable doubt.

## C. Prosecutorial Misconduct

The defendant next argues that the prosecution engaged in misconduct by improperly attempting to elicit testimony from witnesses regarding prior bad acts of the defendant. To prevail on such a claim, the defendant must show that there was an impropriety and that it "affected the verdict to the prejudice of the defendant." State v. Chalmers, 28 S.W.3d 913, 917 (Tenn. 2000); Harrington v. State, 385 S.W.2d 758, 759 (Tenn. 1965). Factors to be considered include: (1) the conduct complained of viewed in light of the facts of the case and surrounding circumstances; (2) any curative measures undertaken by the trial court; (3) the intent of the prosecutor; (4) the cumulative effect of the conduct and any other errors in the record; and (5) the relative strength and weakness of the case. Chalmers, 28 S.W.3d at 917.

The defendant alleges two instances of misconduct by the prosecution. The first occurred during the guilt phase of the trial when, on direct examination, the prosecution asked Union City Police Officer Derrick O'Dell the following question:

Q: And did you question [the defendant] in any manner after he was under arrest?

A: Only after he made the statement that we did better than the Springfield Police Department.

The State did not pursue the issue further and quickly concluded the direct examination of the officer. However, during a brief bench conference, defense counsel objected, arguing that the prosecution was improperly eliciting testimony concerning the defendant's prior bad acts. The trial court warned the prosecutor that such statements could potentially result in a mistrial being declared.

We conclude that the prosecutor's posing of this question to the officer did not constitute prosecutorial misconduct. The officer's answer simply was not responsive to the question. Although the officer's answer possibly alerted the jury to the defendant's criminal activity in another jurisdiction, the prosecutor's question did not call for the officer to make any such reference. The record also shows that the prosecutor was genuinely surprised by the officer's remark. Furthermore, the defendant's confession, in which he admitted to being wanted in other states, was later admitted into evidence and read to the jury. Therefore, any prejudice resulting from Officer O'Dell's remark was harmless.

The second instance of alleged prosecutorial misconduct took place during the sentencing phase of the trial as the defendant's aunt, Roxanne Evans, testified for the defense. During direct examination Ms. Evans had offered testimony regarding the defendant's childhood and family life and had stated that as a child the defendant was quiet and introverted. She also testified that she had never seen the defendant exhibit any violent behavior. On cross-examination the prosecution asked Ms. Evans if she remembered an incident which had occurred while the defendant worked at an automobile detailing shop. Evans replied that she did remember the incident, and the following exchange took place:

Q (by the prosecution):     What happened?

A (by Ms. Evans):     I apologize if my memory seems a little fuzzy. . . . I do remember an incident that Steve took a car and drove to Florida, a car from the shop my brother worked at.

Q:     Not your brother's car; is that correct?

A:     No, sir.

Q:          Some customer's car; is that correct?

A:          I don't know if it was a customer's car, or if it was a
            lot car.  I don't know.

Q:          And drove it to Florida; it that correct?

A:          I believe so.

Q:          And wrecked it?

The defense objected at this point on the ground that the prosecution was violating Tennessee Rule of Evidence 404(b) by attempting to introduce evidence of prior bad acts which reflected on the defendant's character.  In response, the State argued that Ms. Evans' testimony on direct examination had already placed the defendant's character in issue and therefore it was permissible under Tennessee Rule of Evidence 405 to cross-examine her regarding this prior act of the defendant.

Despite the State's argument, the trial court initially sustained the defense objection and prepared to give a limiting instruction to the jury.  However, the prosecutor quickly interjected and called the court's attention to Tennessee Code Annotated section 39-13-204(c), which in a capital sentencing hearing permits the introduction of any evidence "which the court deems to have probative value on the issue of punishment . . . regardless of its admissibility under the rules of evidence."  Tenn. Code Ann. § 39-13-204(c) (1997).  The prosecution argued that testimony regarding the defendant taking the car to Florida had probative value because it served to rebut prior testimony by defense witnesses concerning the defendant's character.  After further consideration, the trial court agreed with the State's argument, overruled defense counsel's objection, and did not give a limiting instruction to the jury.

Ms. Evans' testimony, quoted above, came on cross-examination and related an instance in which the defendant had taken a car without permission several years prior to the crime for which he was now on trial.  It is also important to note that this testimony was given during the sentencing phase of the trial.  Evidence is not excluded at a capital sentencing hearing merely because it is otherwise inadmissible under the Rules of Evidence.  See Tenn. Code Ann. § 39-13-204(c); State v. Stout, 46 S.W.3d 689, 702 (Tenn. 2001).  In a capital sentencing hearing, any evidence relevant to the circumstances of the murder or to the aggravating or mitigating circumstances is admissible in determining punishment if it has probative value.  See Teague, 897 S.W.2d at 250.  Further, due to the constitutional requirement that capital sentencing be conducted in an individualized manner, evidence regarding the defendant's character and background is admissible regardless of its relevance to any aggravating or mitigating circumstances.  Sims, 45 S.W.3d at 13.  Nevertheless, a trial court has the discretion to exclude any evidence that would render the trial fundamentally unfair, or whose probative value is outweighed by its prejudicial effect.  See Tenn. R. Evid. 403; State v. Burns, 979 S.W.2d 276, 282 (Tenn. 1998).

Generally, Rule 404 prohibits the use of character evidence to prove action on a particular occasion in conformity with the character trait. See Tenn. R. Evid. 404. Rule 404(b) specifically serves to filter out evidence of prior bad acts if offered to infer conduct in conformity with a character trait; however, such evidence may be admissible for other purposes. Tenn. R. Evid. 404(b). In cases where character evidence is admissible, Tennessee Rule of Evidence 405 provides that "inquiry on cross-examination is allowable into relevant specific instances of conduct." Tenn. R. Evid. 405(a). However, before inquiring into specific instances of conduct, the trial court must hold a hearing outside the presence of the jury and determine whether a factual basis for the inquiry exists and whether "the probative value of a specific instance of conduct on the character witness's credibility outweighs its prejudicial effect on substantive issues." Id.

In State v. Sims this Court analyzed the relationship between Rule 405 and Tennessee Code Annotated section 39-13-204(c), focusing on the precise issue of whether section 39-13-204(c) precluded application of Rule 405 during a capital sentencing hearing. 45 S.W.3d at 13. We concluded that section 39-13-204(c) provides trial judges with wider discretion than normally permitted under the Rules of Evidence and that trial judges are not required to strictly follow Rule 405 in determining whether the State should be allowed to question a defendant's witness regarding the defendant's prior convictions. Sims, 45 S.W.3d at 14. We have provided the following principles:

> The Rules of Evidence should not be applied to preclude introduction of otherwise reliable evidence that is relevant to the issue of punishment, as it relates to mitigating or aggravating circumstances, the nature and circumstances of the particular crime, or the character and background of the individual defendant. As our case history reveals, however, the discretion allowed judges and attorneys during sentencing in first degree murder cases is not unfettered. Our constitutional standards require inquiry into the reliability, relevance, value, and prejudicial effect of sentencing evidence to preserve fundamental fairness and protect the rights of both the defendant and the victim's family. The rules of evidence can in some instances be helpful guides in reaching these determinations of admissibility. Trial judges are not, however, required to adhere strictly to the rules of evidence. These rules are too restrictive and unwieldy in the arena of capital sentencing.

Id.; see also Stout, 46 S.W.3d at 703.

We also concluded that the issue should not be whether testimony is character evidence under Rules 404 and 405. Rather, the proper focus in a capital sentencing hearing should be whether the testimony is relevant to the mitigating factors presented by the defendant and on the relevance of the defendant's prior bad acts to refute those mitigating circumstances. Sims, 45 S.W.3d at 14. We further noted that when evidence of prior convictions is admitted in a capital sentencing hearing, the trial court should instruct the jury that the evidence is to be considered solely to rebut mitigating testimony related to the defendant's character. Id. at 15.

In Sims, the prosecution was allowed to cross-examine a witness regarding the defendant's prior burglary and theft convictions in order to rebut mitigating evidence that the defendant was not by nature an aggressive person. Id. at 14-15. Likewise, in State v. Stout, evidence of prior convictions for aggravated burglary, theft, reckless endangerment and robbery was allowed to rebut mitigation evidence that the defendant was a "fine, active Christian." 46 S.W.3d at 703.

In the present case, evidence of the defendant's character had already been admitted when the prosecution cross-examined Ms. Evans. On direct examination, Ms. Evans testified that she had never seen any exhibitions of violent behavior by the defendant. She further described the defendant as "always very quiet" and "very affectionate." There was also testimony from another mitigation witness, Crystal St. Clair, that the defendant "was a caring, giving person. . . . [H]e was the type of person that would try to keep trouble down rather than create trouble."

These facts are similar to Sims and Stout in that evidence of the defendant's prior non-violent property crime was sought to be introduced to rebut evidence that the defendant was not a violent person. Accordingly, we conclude that the testimony regarding the defendant's act of taking a vehicle to Florida, although not a crime of violence, was admissible to rebut mitigation testimony regarding the defendant's character. The prosecutor, therefore, did not act improperly in seeking to admit this evidence. Although a limiting instruction should have been given to the jury in this instance, reversal for such an error is "limited to those exceptional cases in which the impeaching testimony is extremely damaging, the need for a limiting instruction is apparent, and the failure to give it results in substantial prejudice to the rights of the accused." State v. Howell, 868 S.W.2d 238, 255 (Tenn. 1993). The trial court's error in this regard was harmless.

### D. Limitation of Testimony by Dr. Caruso

Next, the defendant argues that the trial court erred during the sentencing hearing by preventing Dr. Keith Caruso, a forensic psychiatrist, from fully explaining the details of his diagnosis of the defendant's mental condition.

Prior to Dr. Caruso's testimony a jury-out hearing was held, during which the State expressed concern that Dr. Caruso's opinion was based, in part, on the two prior murders the defendant had committed in Missouri and Oklahoma. Under Tennessee Rule of Evidence 705 an expert may testify "in terms of opinion or inference" without disclosing the "underlying facts or data" upon which the opinion is based. However, on cross-examination, the expert may be required to disclose those underlying facts or data. Tenn. R. Evid. 705. This rule allows the prosecution to impeach the expert's diagnosis by inquiring into any of the defendant's prior bad acts contained in reports relied on by the expert in evaluating the defendant. See State v. Hall, 958 S.W.2d 679, 712 (Tenn. 1997). Any mention of the specific nature of the defendant's other crimes committed in Missouri and Oklahoma had been scrupulously avoided during trial. However, it became evident during the sentencing hearing that the State could rely upon Rule 705 to inquire about these other crimes if they were a basis for Dr. Caruso's diagnosis and opinion. To avoid thus "opening the door" to introduction of these crimes, the trial court limited Dr. Caruso's examination to evidence obtained

from Kim Bowen, from the defendant's former employer, and from medical records and childhood history.

While Tennessee Code Annotated section 39-13-204(c) (1997) permits great latitude in the introduction of evidence during the sentencing phase of a capital trial, the admissibility of evidence is ultimately entrusted to the sound discretion of the trial court. Reid, 91 S.W.3d at 305. Absent an abuse of that discretion, we will not reverse such rulings on appeal. Id. The trial court allowed Dr. Caruso to testify about the defendant's bipolar disorder and substance abuse without being subjected to cross-examination regarding the defendant's prior commission of murders in Missouri and Oklahoma. By doing so, the trial court avoided any potential prejudice that would have resulted from revealing the defendant's prior crimes. Accordingly, we conclude that the trial court did not abuse its discretion in limiting Dr. Caruso's testimony.

The defendant also argues that the trial court erred by interrupting Dr. Caruso's testimony and thus distracting the jury from concentrating on his testimony. The interruption came while Dr. Caruso was giving a long explanation of the various factors that he believed led the defendant to commit the crime in this case. The trial judge stopped the testimony and called for a bench conference, where defense counsel was warned that Dr. Caruso's testimony was non-responsive and rambling. Following the bench conference, Dr. Caruso's examination resumed on a new topic. Upon reviewing the record, we conclude that the trial court's actions did not reflect negatively on Dr. Caruso's testimony. There is no indication that the court acted intentionally to weaken the doctor's testimony. Rather, the trial court was exercising its discretion to curtail non-responsive answers and was actually protecting the defendant from Dr. Caruso's possible inadvertent disclosure of the defendant's other crimes.

### E. "History of Abuse and Neglect" Mitigating Circumstance Instruction

The defendant complains that the trial court erred in failing to instruct the jury on the non-statutory mitigating circumstance of a "history of abuse and neglect." The defendant argued at trial that the rejection and abandonment by his parents amounted to abuse and neglect and requested that the jury be instructed on this non-statutory mitigating circumstance. Concluding that there was no evidence the defendant had suffered abuse and neglect during his childhood, the trial court refused to give a specific jury instruction as to this mitigating circumstance. The trial court did, however, allow the defense to argue a history of abuse and neglect as a mitigating circumstance under the catch-all provision of Tennessee Code Annotated section 39-13-204(j)(9) (1997). The trial court instructed the jury that, in addition to other specific mitigating circumstances, it should consider

> any other mitigating factor which is raised by the evidence produced by either the prosecution or defense at either the guilt or sentencing hearing, that is, you shall consider any aspect of the defendant's character or record, or any aspect of the circumstances of the offense favorable to the defendant which is supported by the evidence.

We begin by noting that this Court has previously held that jury instructions on specific non-statutory mitigating circumstances are not constitutionally mandated. State v. Odom, 928 S.W.2d 18, 30 (Tenn. 1996); State v. Hutchison, 898 S.W.2d 161, 174 (Tenn. 1994). Therefore, the right to such instructions, as well as the form and content of the instructions, derives solely from the statute, which provides:

> [T]he trial judge shall also include in the instructions for the jury to weigh and consider any mitigating circumstances raised by the evidence at either the guilt or sentencing hearing, or both, which shall include, but not be limited to, those circumstances set forth in subsection (j).

Tenn. Code Ann. § 39-13-204(e)(1) (1997). This statute further provides that:

> a reviewing court shall not set aside a sentence of death or of imprisonment for life without the possibility of parole on the ground that the trial court did not specifically instruct the jury as to a requested mitigating factor that is not enumerated in subsection (j).

Id. In Odom, we interpreted this statute to require jury instructions on any circumstances raised by the evidence and proffered by a defendant as having mitigating value. 928 S.W.2d at 30. The instructions on non-statutory mitigating circumstances must not be fact-specific but must instead be "drafted so that when they are considered by the jury, the statutory mitigating circumstances are indistinguishable from the non-statutory mitigating circumstances." Id. at 32.

Generally, in determining whether instructions are erroneous, this Court must review the charge in its entirety and read it as a whole. See State v. Hodges, 944 S.W.2d 346, 352 (Tenn. 1997). A charge should be considered prejudicially erroneous if it fails to fairly submit the legal issues or if it misleads the jury as to the applicable law. Id.

The defendant presented evidence that his father did not interact with him and sent him and his siblings to live with their grandparents. However, there is no evidence of physical, sexual, or mental abuse or neglect. In fact, the defendant's aunt testified that the defendant had a good relationship with his grandfather. The trial court determined that the fact that the defendant suffered from a history of abuse and neglect was not fairly raised by the evidence. We agree. Furthermore, any potential error in this respect was rendered harmless by the catchall instruction.

### F. Mandatory Review Factors

When reviewing a sentence of death, we are required by statute to determine whether:

(A) The sentence of death was imposed in any arbitrary fashion;
(B) The evidence supports the jury's finding of statutory aggravating circumstance or circumstances;

(C) The evidence supports the jury's finding that the aggravating circumstance or circumstances outweigh any mitigating circumstances; and
(D) The sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the nature of the crime and the defendant.

Tenn. Code Ann. § 39-13-206(c)(1) (2003).

### 1. Aggravating and Mitigating Circumstances

The jury found the existence of two aggravating circumstances: (1) "[t]he murder was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or prosecution of the defendant or another" and (2) "[t]he murder was knowingly committed . . . by the defendant, while the defendant had a substantial role in committing or attempting to commit, or was fleeing after having a substantial role in committing or attempting to commit, any first degree murder, arson, rape, robbery, burglary, [or] theft . . . ." Tenn. Code Ann. § 39-13-204(i)(6), (7) (1997).

On appeal the defendant challenges the State's reliance on the (i)(6) aggravating circumstance regarding murder committed for the purpose of avoiding arrest. He contends that the (i)(6) aggravating circumstance should apply only if the evidence showed that he killed Mr. Patterson in order to avoid arrest for the robbery of Mr. Patterson, rather than to avoid prosecution on unrelated charges from other jurisdictions. We disagree.

During the sentencing hearing, Sheriff Mike Parson testified that there were warrants outstanding for the arrest of the defendant in Polk County, Missouri as of the date of Mr. Patterson's murder. The victim, Mr. Patterson, had no connection to these or any other charges pending against the defendant from other jurisdictions. However, the defendant was well aware that there were warrants outstanding for his arrest in other jurisdictions. Had the victim notified the authorities of the defendant's use of the stolen credit card, an investigation would have ensued, and the defendant could have been arrested on these warrants. The defendant admitted that this possibility motivated the murder when he told police, "I knew I was wanted in other states, so I just stabbed him and took off." This evidence supports application of the (i)(6) aggravating circumstance, as the jury could reasonably conclude that the defendant was motivated to murder the victim in order to prevent any investigation that could lead to the defendant's arrest for these unrelated charges from other jurisdictions.

We have previously held that the State must prove that avoidance of prosecution or arrest was one of the purposes motivating the killing in order to apply the (i)(6) aggravating circumstance. See Terry v. State, 46 S.W.3d 147, 162 (Tenn. 2001); Bush, 942 S.W.2d at 504. However, application of this aggravating circumstance is not limited to those situations where the crime sought to be avoided was directly related to the murder. Terry, 46 S.W.3d at 162; State v. Hall, 976 S.W.2d 121, 133 (Tenn. 1998). Rather than looking for a connection between the crimes, "the focus must remain on the defendant's motives for the murder." Terry, 46 S.W.3d at 162.

-21-

The defendant in Terry was a pastor who embezzled money from his church over the course of several years. Id. at 151. Eventually, he began experiencing emotional problems and concocted a plan whereby he would stage his own death and begin a new life elsewhere under an assumed identity. Id. The defendant killed a handyman at the church, left his body in the attic, and then set fire to the church. Id. at 152. At trial, the jury found the defendant had committed the murder for the purpose of avoiding or preventing a lawful arrest or prosecution for the embezzlement of church funds, thus establishing the (i)(6) aggravating circumstance. Id. at 154, 157. The defendant argued that the (i)(6) aggravator did not apply because the murder victim was not the victim of the embezzlement, nor a witness to that crime, nor even a law enforcement officer attempting to arrest the defendant for that crime. Id. at 162. Nevertheless, this Court upheld the defendant's sentence of death upon concluding that there was evidence "from which a reasonable jury could find that the defendant committed the murder, at least in part, to prevent his apprehension for the theft." Id. at 162. We reasoned that the jury could conclude that "because of [the defendant's] desire to avoid arrest or prosecution for his theft, he decided, at least in part, to commit murder and leave behind a body, charred beyond all recognition, to prevent any investigation that would have inevitably occurred had he merely 'disappeared.'" Id. at 163. Like the defendant in Terry, the defendant in the present case killed in order to prevent an investigation that could have ultimately resulted in his arrest for prior, unrelated crimes.

We further conclude that the evidence supports the application of the (i)(7) aggravating circumstance, which requires that "[t]he murder was knowingly committed . . . by the defendant, while the defendant had a substantial role in committing or attempting to commit, or was fleeing after having a substantial role in committing or attempting to commit, any first degree murder, arson, rape, robbery, burglary, [or] theft . . . ." Tenn. Code Ann. § 39-13-204(i) (7) (1997). As discussed previously, the killing was committed during the perpetration of a theft. The evidence shows that upon stabbing the victim, the defendant stole the victim's gun, cash and credit cards. The defendant also took the victim's wrecker and drove it to another location so that he could remove his vehicle from the back of the wrecker. This evidence is sufficient to support the jury's finding that the (i)(7) aggravating factor was proven beyond a reasonable doubt.

In determining whether the evidence supports the application of an aggravating circumstance, the proper standard to consider is whether, after reviewing the evidence in the light most favorable to the State, a rational trier of fact could have found the existence of the aggravating circumstance beyond a reasonable doubt. State v. Henderson, 24 S.W.3d 307, 313 (Tenn. 2000) (citing State v. Carter, 988 S.W.2d 145, 150 (Tenn. 1999)). After a careful review of the testimony and evidence presented at the sentencing hearing, we conclude that the evidence fully supports the jury's findings that the (i)(6) and (i)(7) aggravating circumstances had been established beyond a reasonable doubt.

We also conclude that the evidence supports the jury's finding that the two aggravating circumstances outweighed the various mitigating circumstances beyond a reasonable doubt. The primary mitigation evidence was that the defendant suffered from bipolar disorder and that his relationship with his parents was dysfunctional. However, to the extent that his mental illness played a role in the killing, the expert testimony from Dr. Caruso showed that it did not prevent the

defendant from knowing what he was doing, forming the requisite mens rea, or understanding the wrongfulness of his actions. The evidence supports the jury's determination.

## 2. *Comparative Proportionality Review*

In cases where a defendant has been sentenced to death, we are required to conduct a comparative proportionality review pursuant to Tennessee Code Annotated section 39-13-206(c)(1)(D) (1997). Comparative proportionality review seeks to ensure that the death penalty is applied consistently and not arbitrarily or capriciously. Terry, 46 S.W.3d at 163. Our analysis is intended to determine whether the defendant's sentence of death "is disproportionate to the sentences imposed for similar crimes and similar defendants." Bland, 958 S.W.2d at 664.

In undertaking this analysis, we apply the precedent-seeking method of comparative proportionality review, in which we compare the present case with other cases involving similar defendants and similar crimes. See Bland, 958 S.W.2d at 664. We examine the facts and circumstances of the crime, the defendant's characteristics, and the aggravating and mitigating factors involved. Id. Because no two defendants or crimes are identical, we cannot limit our comparison to those cases where a defendant's death sentence is "perfectly symmetrical." Id. at 665. Rather, we seek only to "identify and invalidate the aberrant death sentence." Id. A sentence of death is disproportionate when "the case taken as a whole is plainly lacking in circumstances consistent with those in cases where the death penalty has been imposed." Id. at 668.

The pool of cases we consider in a comparative proportionality review includes those first degree murder cases in which the State sought the death penalty, a capital sentencing hearing was held, and the jury determined whether the sentence should be life imprisonment, life imprisonment without possibility of parole, or death. State v. Godsey, 60 S.W.3d 759, 783 (Tenn. 2001); Bland, 958 S.W.2d at 666. Several nonexclusive factors are relevant to identifying and comparing similar cases: (1) the means of death; (2) the manner of death, such as whether the death was violent or torturous; (3) the motivation for the killing; (4) the place of death; (5) the similarity of the victims' circumstances including age, physical and mental conditions, and the victims' treatment during the killing; (6) the absence or presence of premeditation; (7) the absence or presence of provocation; (8) the absence or presence of justification; and (9) the injury to and effects on non-decedent victims. Terry, 46 S.W.3d at 164; see also State v. Henderson, 24 S.W.3d 307, 316 (Tenn. 2000). Also, we have identified several nonexclusive factors relevant to comparing the defendant's characteristics, including: (1) the defendant's prior criminal record or prior criminal activity; (2) the defendant's age, race, and gender; (3) the defendant's mental, emotional or physical condition; (4) the defendant's involvement or role in the murder; (5) the defendant's cooperation with authorities; (6) the defendant's remorse; (7) the defendant's knowledge of helplessness of victim(s); (8) the defendant's capacity for rehabilitation. Terry, 46 S.W.3d at 164; Henderson 24 S.W.3d at 316.

The proof in this case showed that the defendant's vehicle broke down and was towed to a service station by the victim. The defendant then attempted to pay for the wrecker service with a stolen credit card. When the card was rejected, the defendant stabbed the victim because the

defendant "knew [he] was wanted in other states." The defendant then proceeded to drive the wrecker off the property so that he could remove his car. He then returned to the service station where he attempted to conceal the victim's body and stole the victim's gun, cash and credit cards.

In mitigation, proof was presented through testimony from Dr. Caruso that the defendant suffered from bipolar disorder and that persons with this illness may be very excitable, irritable, very impulsive, may have tremendous amounts of energy, and may feel very agitated. Dr. Caruso also testified that the defendant has a personality disorder with borderline and antisocial traits and that the defendant was suffering from extreme mental or emotional disturbance at the time of this crime. Proof was also presented regarding the defendant's childhood. His parents divorced when he was young, and he and his sisters were sent to live with their grandparents.

We conclude that the defendant's sentence of death in this case was not applied arbitrarily and was not excessive or disproportionate when compared to similar cases in which the same penalty was imposed. We have upheld the death penalty in several similar cases where the defendant stole from the victims and committed murder to avoid arrest or prosecution. See State v. Powers, 101 S.W.3d 383 (Tenn. 2003) (after abducting, robbing, and shooting his victim, the defendant was sentenced to death based on the aggravating circumstances that he had prior violent felony convictions, he committed the murder to avoid arrest and prosecution, and he committed the murder while committing robbery and kidnapping); State v. Reid, 91 S.W.3d 247 (Tenn. 2002) (defendant sentenced to death for shooting two restaurant employees during the course of a robbery, based on the aggravating circumstances that the murders were committed during a robbery and to avoid arrest, and that the defendant had prior violent felony convictions); State v. Hall, 976 S.W.2d 121 (Tenn. 1998) (after shooting victims and stealing their automobile, defendant was sentenced to death based upon aggravating circumstances that the murders were committed to avoid arrest and prosecution, the murders were committed during the commission of a theft, the murders were committed during escape, and the defendant had prior violent felony conviction); State v. Bush, 942 S.W.2d 489 (Tenn. 1997) (defendant stabbed burglary victim and was sentenced to death based on the aggravating circumstances that the murder was committed to avoid arrest and prosecution and that the murder was heinous, atrocious or cruel); State v. Carter, 714 S.W.2d 241 (Tenn. 1986) (after abducting his victim, shooting him to death, and stealing his truck, defendant was sentenced to death based on the aggravating circumstances that he committed the murder to avoid arrest and prosecution and committed the murder while committing larceny and kidnapping); State v. Melson, 638 S.W.2d 342 (Tenn. 1982) (defendant beat victim to death with hammer because she discovered that he had committed a theft; defendant sentenced to death based on aggravating circumstances that the murder was heinous, atrocious or cruel and that the murder was committed for the purpose of avoiding arrest and prosecution).

We have also upheld the death penalty in cases involving defendants who introduced mitigating circumstances substantially similar to those presented by the present defendant. For example, we have affirmed the sentence of death for defendants who experienced a troubled childhood and suffered from emotional problems. See State v. Pike, 978 S.W.2d 904 (Tenn. 1998) (death penalty imposed on finding of (i)(6) aggravating circumstance, despite evidence of troubled

childhood and personality disorders); <u>Bush</u>, 942 S.W.2d at 493 (imposing death penalty upon finding the (i)(5) and (i)(6) aggravating circumstances, despite substantial evidence of defendant's troubled childhood and mental problems); <u>State v. Hines</u>, 919 S.W.2d 573 (Tenn. 1995) (imposing death penalty upon finding the (i)(2), (i)(5) and (i)(7) aggravating circumstances despite evidence that the defendant had a troubled childhood, was abandoned by his parents, and suffered from self-destructive behavior and personality disorder); <u>State v. Smith</u>, 868 S.W.2d 561 (Tenn. 1993) (imposing death penalty upon finding the (i)(5), (i)(6), (i)(7), and (i)(12) aggravating circumstances despite mitigation evidence that defendant had been hospitalized for depression and paranoid personality disorder).

While no two capital cases are identical, we have compared the circumstances of the present case and the present defendant with the circumstances of the cases set out above and those individual defendants, and conclude that this case is not plainly lacking in circumstances consistent with other similar cases in which the death penalty has been imposed. Thus, the defendant's sentence of death is not disproportionate considering the circumstances of the crime and the defendant.

### III. Conclusion

After considering the entire record in this case we conclude that all of defendant's assignments of error are without merit. Furthermore, we find that the sentence of death was not imposed arbitrarily, that the sentence of death is not excessive or disproportionate, and that the evidence supports the jury's finding that the aggravating circumstances outweigh the mitigating circumstances beyond a reasonable doubt. With respect to issues not specifically addressed within this opinion, we affirm the decision of the Court of Criminal Appeals. Relevant portions of that opinion are published hereafter as an appendix. The defendant's convictions and sentences are affirmed. The sentence of death shall be carried out as provided by law on the 8th day of September, 2005, unless otherwise ordered by this Court or other proper authority.

It appearing that the defendant is indigent, costs of this appeal are taxed to the State of Tennessee.

_____
WILLIAM M. BARKER, JUSTICE